FIRST DIVISION
OCTOBER 29, 2007

No. 1-06-3341

| | | |
|---|---|---|
| EMIGRANT MORTGAGE COMPANY, INC., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03 M1 105022 |
| CHICAGO FINANCIAL SERVICES, INC., | ) ) ) | Honorable Wayne Rhine, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

This is a dispute between Emigrant Mortgage Company, Inc. (Emigrant), a New York based mortgage lender, and Chicago Financial Services, Inc. (CFS), a Chicago based mortgage loan broker, concerning commissions paid by Emigrant to CFS pursuant to contract. The business relationship between the parties is controlled by a written contract, the broker direct agreement (hereinafter agreement), and a written modification to that contract. Emigrant filed suit alleging CFS's breach of the modified agreement. A bench trial resulted in a judgment in Emigrant's favor. The trial court determined that a valid and enforceable contract existed between the parties and that CFS breached the terms of that contract, and it awarded Emigrant $109,799.79 in damages, plus $53,837.95 in costs and attorney fees. CFS filed a timely notice of appeal.

BACKGROUND

Emigrant is in the business of processing, underwriting, and funding mortgage loans secured by real property. CFS is in the business of taking applications for residential mortgage loans and submitting those loans to lenders. CFS brokers loans for approximately 15 to 20 mortgage lenders in addition to Emigrant. On October 9, 1998, Emigrant and CFS entered into an agreement whereby CFS would be paid a fee for each loan that it brokered for Emigrant, as determined by the fee schedule in the agreement. The agreement provides that "[t]his Agreement shall be governed by, and construed in accordance with the laws of the State of New York, excluding such laws' provisions relating to choice of law."

At the core of this dispute are two commission forfeiture provisions of the modified agreement. Section 10.2 of the original agreement provided, in pertinent part:

"Notwithstanding anything in this Agreement to the contrary, Broker shall not, on behalf of itself or any party other than Emigrant, solicit or otherwise conduct business with any Borrower whose Mortgage Loan closes pursuant to this Agreement for any transaction relating to the Mortgage Loan or any other loan, whether held by Emigrant or not, which is also secured by the premises securing the Mortgage Loan and while Emigrant, or any subsidiary or affiliate of Emigrant, holds or services the Mortgage Loan, unless it obtains the express prior written consent of Emigrant. In the event of any breach by the Broker of the foregoing, Emigrant shall be entitled to obtain injunctive relief against Broker and

2

any party on behalf of which any such solicitation is made to prevent a continuing breach hereof, and in addition, and not in lieu thereof or of any remedy or relief to which Emigrant may be entitled either at law or in equity resulting from such breach or as liquidated damages, Broker shall return to Emigrant any and all fees paid by Emigrant to Broker in connection with such Mortgage Loan promptly upon receipt from Emigrant of written notice of such breach and demand for return of such fees, together with interest thereon at the legal rate of interest from the date of payment of such fee by Emigrant to the date of return thereof."

The agreement was modified on July 26, 2001. The modification was signed by CFS's president, Phillip Brilliant, and altered the terms of section 10.2 and created a new section 10.3.

Section 10.2 of the modified agreement states, in relevant part, that CFS "shall not *** solicit or otherwise conduct business with any Borrower whose Mortgage Loan closes pursuant to this agreement for any transaction relating to the Mortgage Loan or any other loan *** unless it obtains the express prior written consent of Emigrant." If CFS does solicit or otherwise conduct business with any borrower, section 10.2 requires CFS to "return to Emigrant any and all fees paid by Emigrant to [CFS] in connection with [those borrowers' loans] promptly upon receipt from Emigrant of written notice of such breach and demand for return of such fees ." Section 10.3 of the modified agreement applies to prepayments of mortgage loans. Under this section, if Emigrant determines, in its sole discretion, that the overall number of prepayments on CFS-

3

brokered loans is excessive, then CFS is required to refund to Emigrant part of the fees it received for those loans that prepaid in full during the first year of their term. Specifically, section 10.3 states, "[s]hould the overall amount of Prepayments relating to Mortgage Loans submitted by [CFS] to Emigrant be excessive, as determined by Emigrant in its sole discretion, then the terms of this subsection 10.3 shall apply." The amount to be repaid is based on a schedule in section 10.3 that decreases over time based on the number of days between the closing date and the prepayment date. If a loan prepays over one year after the closing date, CFS is not required to repay any money to Emigrant pursuant to section 10.3.

Emigrant determined that a prepayment rate of 50% or more was excessive. To determine that rate, Emigrant collected data on all of its Illinois brokers and the loans they had brokered on behalf of Emigrant. Emigrant states that it began by "looking at its payoffs for all of its brokers company-wide, from a certain time frame, to determine what Prepayment rate should be deemed excessive." Based on this information, Emigrant established the 50% figure, considering the dollar amounts of the payoffs in the process.

On January 24, 2003, Emigrant filed a complaint against CFS alleging breach of section 10.3 and, in a separate count, unjust enrichment. Emigrant sought $19,496.39 in damages alleging the prepayment of 10 loans.

CFS answered and, after some discovery, moved for partial summary judgment, arguing that all but one of the loan transactions identified in the complaint "closed" before the modification became effective. The trial court denied the motion for partial summary judgment.

4

On May 14, 2004, Emigrant filed an amended complaint. Count I of the amended complaint alleged breach of section 10.2 and sought $99,883.54, plus interest, in damages for fees paid to CFS. Count II alleged breach of section 10.3 and sought $9,916.25 in damages. Count III asserted a claim for breach of section 10.3, described as an alternative to counts I and II, if the trial court were to determine that CFS did not violate section 10.2 of the contract and sought $27,774.53 in damages. Count IV alleged unjust enrichment and sought $108,299.79 in damages.

A bench trial was held on December 9, 2005. At trial, CFS argued that section 10.2 was an unenforceable restrictive covenant under New York law as section 10.2 was unlimited in duration. CFS then argued that Emigrant could not recoup commissions, pursuant to section 10.3, earned and paid before the contract modification was signed. Finally, CFS argued that Emigrant had a duty to act reasonably in exercising its discretion under section 10.3 of the modified agreement and had not done so.

On May 8, 2006, the trial court issued a written decision in this case. The court found (1) that section 10.2 was not unreasonable as to duration and scope and can be enforced under New York law, (2) that the modification was enforceable because New York law does not require that a written contract modification be supported by consideration, if the modification is signed by the party that the modification is enforced against, (3) that despite New York law not requiring consideration, the written modification was supported by consideration because Emigrant would have terminated its relationship with CFS had CFS not signed the modification, (4) that Emigrant had acted in good faith in setting the "excessive" prepayment rate at 50% or more, and (5)

5

that Emigrant was not attempting to enforce section 10.3 of the modified agreement retroactively because that contract provision was triggered by actions after the modification had taken effect.

ANALYSIS

On appeal, CFS argues that (1) section 10.2 of the modified agreement operates as an unenforceable restrictive covenant, (2) the modification is unenforceable because it was not supported by consideration, (3) Emigrant cannot retroactively enforce section 10.3 of the modified agreement to commissions already earned, and (4) Emigrant did not act in "good faith and fair dealing" when it set the "excessive" prepayment rate under section 10.3 of the modified agreement at 50% or more.

The proper standard of review, when a challenge is made to a trial court's ruling following a bench trial is "whether the trial court's judgment is against the manifest weight of the evidence." *General Motors Acceptance Corp. v. Stoval*, 374 Ill. App. 3d 1064, 1071 (2007). A judgment is against the manifest weight of the evidence "only when an opposite conclusion ' "is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence. [Citations.]" ' " *Stoval*, 374 Ill. App. 3d at 1071. "[A] reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the trier of fact." *In re Application of the County Treasurer*, 131 Ill. 2d 541, 549 (1989).

Construction of a contract, however, is a question of law that is reviewed *de novo*. *Klein v. Caremark International, Inc.*, 329 Ill. App. 3d 892, 902 (2002).

As noted, the agreement provides that "[t]his Agreement shall be governed by, and construed in accordance with the laws of the State of New York, excluding such laws' provisions relating to choice of law."

The language of the contract is clear, and neither party disagrees that the substantive law of New York applied to this case. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A, Inc.*, 199 Ill. 2d 325, 351 (2002) ("[g]enerally, choice of law provisions will be honored"). So long as the provision does not contravene Illinois public policy and there is some relationship between the chosen forum and the parties to the transaction, an express choice of law provision will be given full effect. *The Hartford v. Burns Inc.*, 172 Ill. App. 3d 184, 187 (1988). However, with regard to procedural matters, the law of the forum controls. *Belleville Toyota, Inc.*, 199 Ill. 2d at 351.

All of CFS's arguments on appeal deal with substantive contract law. New York law, therefore, will be applied to the contract issues in this case. *Ragan v. AT&T Corp.*, 355 Ill. App. 3d 1143, 1155 (2005), citing *Hutcherson v. Sears Roebuck & Co.*, 342 Ill. App. 3d 109, 116 (2003). In applying the law of New York, we are to accept the decision of an intermediate court of review as an accurate statement of the law of its own state, in the absence of any conflicting decision by another appellate court of coordinate jurisdiction in the state or by its highest court of review. *Ragan*, 355 Ill. App. 3d at 1155, citing *Moscov v. Mutual Life Insurance Co. of New York*, 387 Ill. 378, 389 (1944).

We now turn to CFS's arguments on appeal. CFS argues that section 10.2 of the modified agreement operates as an unenforceable restrictive covenant.

New York courts generally recognize covenants not to compete in three situations. *Cliff v. R.R.S. Inc.*, 620 N.Y.S.2d 190, 192, 207 A.D.2d 17, 19 (1994). *Cliff* states:

"First when the goodwill of an established business is sold, there is an implied covenant restricting the seller from soliciting his or her former customers after purporting to transfer their goodwill to the purchaser [citation]. Such a covenant is not limited in duration [citations]. Alternatively, a contract for the sale of a business may contain an express covenant not to compete, which related to the seller's duty to refrain from competing with the purchaser [citation]. If an express covenant is present, it will be enforced if reasonable in geographic scope and duration [citations]. Finally, a restrictive covenant may surface in the context of an employment contract, in which case it will be enforced only to the extent that 'it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee' [citation]. This, in turn, generally requires a showing that enforcement of the covenant is necessary to protect the employer's trade secrets or confidential customer lists [citations]." *Cliff*, 620 N.Y.S.2d at 192, 207 A.D.2d at 19.

New York courts also recognize that not all restrictive covenants fall squarely into any of the aforementioned categories and, absent a public policy violation, parties are free to enter into any sort of arrangement they wish. *Cliff*, 620 N.Y.S.2d at 192, 207

8

A.D.2d at 20. However, all arrangements resembling restrictive covenants are subject to the " 'overriding limitation of "reasonableness." ' " *Karpinski v. Ingrasci*, 28 N.Y.2d 45, 49, 320 N.Y.S.2d 1, 4, 268 N.E.2d 751, 753 (1971), citing *Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 606, 196 N.E.2d 245, 248 (1963); *Millet v. Slocum*, 5 N.Y.2d 734, 177 N.Y.S.2d 716, 152 N.E.2d 672 (1958); *Lynch v. Bailey*, 300 N.Y. 615, 90 N.E.2d 484 (1949); *Interstate Tea Co. v. Alt*, 271 N.Y. 76, 80.

The restrictive covenant entered into by the parties in the case at bar concerns forfeiture of commissions paid to CFS by Emigrant. As noted, CFS is paid upon its brokering of a mortgage loan on behalf of Emigrant. According to section 10.2 of the modified agreement, if CFS solicits or conducts business with any Borrower whose mortgage loan closes pursuant to the agreement for any transaction relating to the mortgage loan or any other loan, CFS must then return to Emigrant any fees paid by Emigrant in connection with that borrower's loans. This limitation on CFS's ability to solicit borrowers away from Emigrant, after receiving commissions for introducing them to Emigrant, seems entirely reasonable when considering the nature of Emigrant's business. Emigrant only makes a profit when loans remain outstanding. It is reasonable for Emigrant to place a limitation deterring the solicitation of borrowers by its brokers, especially after it has paid its brokers for courting the borrower on behalf of Emigrant in the first place.

Despite the forgoing, CFS argues that section 10.2 operates as an unreasonable restrictive covenant because the restriction can operate for an unreasonable duration namely, the life of the loan, sometimes reaching 30 years. However, it is settled law in

No. 1-06-3341

New York that a covenant will not be stricken merely because it contains no time limit or is expressly made unlimited as to time. *Karpinski*, 28 N.Y.2d at 50, 320 N.Y.S.2d at 5, 268 N.E.2d at 753. Furthermore, for the reasons already given, the restrictive covenant is only worthwhile to Emigrant if it operates for the life of the loan.

CFS then argues that the July 6, 2001, modification to the agreement is unenforceable because it was not supported by consideration. We find CFS's argument unpersuasive.

The modification, upon which Emigrant's contract causes of action are based, needed no new consideration to be enforceable against its signatory, CFS, under New York's General Obligations Law (N.Y. Gen. Oblig. Law §5-1101 (West 2001)). Section 5-1103 of the General Obligations Law states:

"An agreement, promise or undertaking to change or modify, or to discharge in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property, shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing, modifying, or discharging such contract, obligation, lease, mortgage or security interest, shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge *** ." N.Y. Gen. Oblig. Law §5-1103 (West 2001).

In any event, the modification is a valid and enforceable contract supported by consideration under New York law. The consideration in this case is the continued

10

relationship between the parties. *Zellner v. Conrad*, 589 N.Y.S.2d 803, 907, 183 A.D.2d 250, 256 (1992). *Zellner* reiterated the long-standing principle that an independent contractor that provides services under a contract similar to the one at issue in this case can be terminated at any point, without cause. *Zellner*, 589 N.Y.S.2d at 907, 183 A.D.2d at 256. Under *Zellner*, forbearance of the right to terminate a business relationship is a legal detriment which can stand as consideration for a modification. *Zellner*, 183 A.D.2d at 256.

CFS then argues that Emigrant cannot retroactively enforce section 10.3 of the modified agreement to commissions already earned. As noted, section 10.3 of the modified agreement applies to prepayments of mortgage loans. Under that section, if Emigrant determines, in its sole discretion, that the overall number of prepayments on CFS brokered loans are excessive, then CFS is required to refund to Emigrant part of the fees it received for those loans that prepaid in full during the first year of their term. The amount to be repaid is based on a schedule in section 10.3 that decreases over time based on the number of days between the closing date and the prepayment date.

CFS argues that section 10.3 is being applied retroactively because the modification to the agreement occurred after the majority of the loans upon which Emigrant seeks to apply section 10.3 had "closed." CFS's argument presupposes that the triggering event for application of section 10.3 is the closing of the loans. However, as is clear from the language of the modification, the triggering event for application of section 10.3 is the *prepayment* of the loans. Our review of the record reveals all

11

prepayments for which Emigrant seeks damages occurred after the modification. Therefore, CFS's argument must fail.

CFS finally argues that Emigrant had a duty to exercise its discretion in determining what was an "excessive" prepayment rate under section 10.3 of the modified agreement, and did not do so. CFS's argument is unpersuasive.

Every contract governed by New York law includes an implied covenant of good faith and fair dealing. *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979, 663 N.E.2d 289, 291 (1995). However, the duty of good faith and fair dealing is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship. *Dalton*, 87 N.Y.2d at 389 639 N.Y.S.2d at 979-80, 663 N.E.2d at 291-92.

Section 10.3 operates to allocate to Emigrant's brokers part of the financial loss Emigrant would suffer if a prepayment occurred. The parties here agree that section 10.3 allows Emigrant unfettered discretion is setting the rate at which prepayments would be considered "excessive." However, CFS argues that Emigrant's determination of 50% was unreasonable because nothing in the agreement documented how this determination would be made. Nevertheless, nothing in the agreement required Emigrant to explain its methodology in arriving at the 50% figure. In fact, Emigrant bargained for unfettered discretion in determining that figure and should receive the benefit of that bargain.

Moreover, nothing in the record of this case demonstrates that Emigrant exercised bad faith in reaching the "excessive" prepayment rate. The record demonstrates that Emigrant arrived at that figure by looking at its payoffs for all of its brokers to determine

No. 1-06-3341

what prepayment rate should be deemed excessive. CFS has pointed to nothing contradictory in the record to suggest that Emigrant exercised its authority under section 10.3 of the modified agreement in an arbitrary or capricious manner. *Dalton*, 87 N.Y.2d at 389, 639 N.Y.S.2d at 979-80, 663 N.E.2d at 291-92.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAHILL, P.J., and WOLFSON, J., concur.

13