# Illinois Official Reports

## Appellate Court

*Diocese of Quincy v. Episcopal Church*, 2014 IL App (4th) 130901

Appellate Court
Caption

THE DIOCESE OF QUINCY and THE TRUSTEES OF FUNDS AND PROPERTY OF THE DIOCESE OF QUINCY, Plaintiffs-Appellees, v. THE EPISCOPAL CHURCH, Defendant-Appellant, and NATIONAL CITY BANK, n/k/a PNC BANK, a National Association, Defendant, and THE EPISCOPAL CHURCH, Counterplaintiff-Appellant, v. EDWARD A. DEN BLAAUWEN, CHRIS POTTHOFF, LEAH DAY, LEE ROY GROFF, FRANK DUNAWAY, MARK L. GAMAGE, BRYCE DEXTER, MICHAEL S. BROOKS, LINDA TERLESKY, WARREN WILKINS, RONALD R. DAMEWOOD, JR., NELL GERMAN, OSCAR P. SEARA, ANDREW AINLEY, KATHI KING, RAMSEY EASTERLING, and ALBERTO MORALES, Counterdefendants-Appellees, and THE DIOCESE OF QUINCY OF THE EPISCOPAL CHURCH, Counterplaintiff in Intervention-Appellant, v. EDWARD A. DEN BLAAUWEN, CHRIS POTTHOFF, LEAH DAY, LEE ROY GROFF, FRANK DUNAWAY, MARK L. GAMAGE, BRYCE DEXTER, MICHAEL S. BROOKS, LINDA TERLESKY, WARREN WILKINS, RONALD R. DAMEWOOD, JR., NELL GERMAN, OSCAR P. SEARA, ANDREW AINLEY, KATHI KING, RAMSEY EASTERLING, and ALBERTO MORALES, Counterdefendants-Appellees.

District & No.

Fourth District
Docket No. 4-13-0901

Filed

July 24, 2014

**Held**

(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*)

In an action arising from a dispute over the ownership of a parcel of real estate and a substantial bank account following the decision of plaintiff diocese of a religious organization to realign itself with another religious organization as the result of a theological disagreement, the trial court properly found that the real estate and the bank account belonged to the diocese, since the evidence did not reveal any express or implied trust, or any other interest vested in the organization, and the trial court's decision was not against the manifest weight of the evidence.

**Decision Under Review**

Appeal from the Circuit Court of Adams County, No. 09-MR-31; the Hon. Thomas J. Ortbal, Judge, presiding.

**Judgment**

Affirmed; motion denied.

**Counsel on Appeal**

Thomas B. Ewing, of Ewing & Scott, of Lewistown, and David Booth Beers and Mary E. Kostel (argued), both of Goodwin Procter LLP, of Washington, D.C., for appellant.

Talmadge G. Brenner, of Quincy, for appellee Alberto Morales.

Kent R. Schnack, of Law Office of Kent R. Schnack, P.C., of Quincy, Allan S. Haley, of Haley & Bilheimer, of Nevada City, California, and Charles Alan Runyan, of Speight & Runyan, of Beaufort, South Carolina, for other appellees.

**Panel**

JUSTICE POPE delivered the judgment of the court, with opinion. Justices Harris and Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1        In November 2008, plaintiff, the Diocese of Quincy (Diocese), voted to end its association with defendant-counterplaintiff, the Episcopal Church (Church), due to certain theological

disagreements. Thereafter, it realigned itself with another religious organization. Upon learning of the Diocese's decision to disassociate, the Church contacted National City Bank, n/k/a PNC Bank (National City), and informed it a disagreement had arisen over the ownership of funds (amounting to several million dollars) deposited with National City by the Diocese (testimony indicated as of December 31, 2012, National City was holding approximately $3,579,778 for the Diocese). According to the Church, it had an "enforceable interest" to ensure the funds were used for the mission of the Church and for counterplaintiff in intervention, the Diocese of Quincy of the Episcopal Church (Episcopal Diocese), which was created by the Church from the remaining loyal Episcopalians. In response, National City froze the funds pending the resolution of this matter.

¶ 2    In March 2009, the Diocese filed a complaint for declaratory judgment, seeking a determination it owned the funds. Thereafter, the Church and the Episcopal Diocese (collectively, the Church) filed a counterclaim for declaratory relief. After an exhaustive bench trial, the trial court, applying neutral principles of law, found in favor of the Diocese and against the Church.

¶ 3    The Church appeals, arguing the trial court erred (1) in failing to defer to the Church's determination the Diocese had no power to withdraw from the Church, (2) in concluding it had no authority to enforce the Church's determination as to the identity of the true diocesan leaders, and (3) by failing to enforce commitments between the Church and the Diocese regarding diocesan property. We affirm.

¶ 4                                          I. BACKGROUND

¶ 5    Because the parties are familiar with the voluminous amount of evidence presented in this case (the record on appeal exceeds 15,000 pages), we recount only the evidence necessary to resolve the issues raised on appeal.

¶ 6    The Church is an unincorporated association created in 1789 and headquartered in New York. The Church's constitutions and canons are its governing documents. In 1877, the Diocese was formed. In 1893, the Diocese formed an Illinois not-for-profit corporation called "The Trustees of Funds and Property of the Diocese of Quincy" (Trustees). The Trustees hold, manage, and distribute the Diocese's funds. The original corporate bylaws stated the organizational purpose was "to receive, manage, and disburse all funds and property acquired by it for use of the Diocese of Quincy of the Protestant Episcopal Church in the United States according to the expressed intention of the donors or as directed by the Synod [(the diocesan council)], in accordance with the Constitution and Canons of the Diocese."

¶ 7    In 1999, the "Discretionary Agency Agreement," which is the current contract between the Trustees and National City, was executed. That agreement provided National City would retain physical custody of the Trustees' investment securities. Pursuant to the agreement, the Trustees would approve investment policy and National City would carry it out. National City would also manage the funds, collect interest, provide bookkeeping, and distribute funds upon the Trustees' request. It is undisputed the Church is not a party to that agreement.

¶ 8    In 2005, the Diocese incorporated as an Illinois not-for-profit corporation called "the Diocese of Quincy." Its stated purpose was "to carry out church and religious functions and operations as a duly constituted diocese, a constituent member of the Anglican Communion and the one Holy, Catholic and Apostolic Church." The articles of incorporation list the

corporation's directors, who were also members of the Diocese. It is undisputed no member of the Church has served as a director of either the Diocese of Quincy or Trustees corporations.

¶ 9    Over the years a doctrinal controversy developed, which resulted in a schism between the Diocese and the Church. In November 2008, the Diocese amended article II of its constitution, annulling its accession to the Church's constitution and canons. The Diocese voted to withdraw from the Church and enter into membership with the Anglican Church of the Southern Cone.

¶ 10    On March 6, 2009, the Diocese filed its annual corporate report with the State of Illinois. The report listed the directors of the corporation, who were also members of the Diocese.

¶ 11    On April 2, 2009, the Trustees filed their annual report with the State. The report listed members of the Diocese as the directors of that corporation. The report reflected an amendment to article I, section 3, removing the description of the Diocese "of the Protestant Episcopal Church of the United States" from the "Purposes" section of the bylaws. The report also reflected a change in article III, section 2, regarding the qualifications of membership. The amended language removed any requirement the Trustees be "communicants of the Protestant Episcopal Church in the United States." The amended section provided, in pertinent part, the following: "Trustees need not be residents of Illinois, but shall be communicants in good standing with their parish or mission church within the Diocese of Quincy."

¶ 12    On April 4, 2009, the Church declared void the Diocese's November 2008 decision to disaffiliate. According to the Church, the November vote had no effect and did not serve to remove the Diocese from the Church. The Church also denounced the Diocese's amendment of article II of the diocesan constitution to eliminate the Diocese's accession to the Church's rules and governance. The Church then passed its own resolution restoring the original article II language. The Church also elected a new bishop of the Episcopal Diocese as well as other new leaders.

¶ 13    Thereafter, the Church objected to the control of diocesan assets by the Diocese's members. The Church took the position the new bishop and other newly elected leaders were the true leaders of the diocese and thus should be considered the leaders of the diocesan corporations, *i.e.*, the Trustees and "the Diocese of Quincy" corporation.

¶ 14    In a January 9, 2009, letter to National City, the Church wrote the following:

"We represent the Protestant Episcopal Church of the United States of America, also known as the Episcopal Church, and its Presiding Bishop, the Most Rev. Katharine Jefferts Schori. The Diocese of Quincy, as well as all parishes, missions, foundations, and other institutions related to it, are subordinate entities to the Episcopal Church under the Constitution and Canons of the Church. The Episcopal Church has a lengthy enforceable interest in ensuring that all property of the Diocese, its parishes, missions, foundations, and other related institutions are held and used for the mission of the Church and Diocese.

We understand that you are the Custodian of the Diocese's Endowment Funds. This letter is to inform you that a disagreement has arisen over the proper ownership of these funds. A faction within the Diocese purports to have removed the Diocese from the Episcopal Church, and claims to own these funds. The Episcopal Church takes a contrary view, which is that the funds continue to be owned by the Diocese which

- 4 -

remains a subordinate part of the Episcopal Church, and must be used solely for the mission of the Church and the subordinate Diocese. ***

The Episcopal Church shall therefore hold [National City] in your role as Custodian of the Diocese's Endowment Funds accountable for any dispositions made by you of such funds at the direction of any of the above listed persons or anyone else on their behalf."

¶ 15 In response, National City froze future distribution of funds pending resolution of the matter.

¶ 16 On March 30, 2009, the Diocese filed a complaint for declaratory judgment, requesting a declaration of rights regarding the funds held by National City.

¶ 17 On March 3, 2010, the Church and Episcopal Diocese filed an amended counterclaim seeking declaratory and injunctive relief against the Diocese's directors and trustees. The Church argued "the former Episcopalians who comprised the former leadership of the [Diocese] and now claim to have left the Church to join another denomination lost any right to control Episcopal diocesan and parish property when they left the Church." According to the counterclaim, the Diocese was a subordinate part of the Church, whose governance structure was hierarchical in nature. As such, it argued the trial court should defer to and enforce the Church's findings those individuals holding offices in the Diocese of Quincy and Trustees corporations vacated their offices by leaving the Church. The Church elected new persons, whom it considered the true leaders of the diocesan corporations, to fill those vacancies. Accordingly, the Church asked the court to declare those individuals the directors of the corporations.

¶ 18 On March 9, 2010, the Church filed a motion for summary judgment, arguing documentary evidence showed (1) the Diocese did not leave the Church because, by its rules, it could not and (2) the individuals elected by the Church should be recognized by the court as the true leaders of the diocese and diocesan corporations. On December 16, 2011, the trial court denied the Church's motion.

¶ 19 During the three-week trial that followed, 11 witnesses testified. We will recount only what is necessary to resolve the issues raised on appeal.

¶ 20 Dr. Robert Bruce Mullin testified for the Church as an expert regarding its structure and history. Mullin opined the Church was hierarchical. When asked the basis for his opinion, Mullin responded, "Because it is self-evident from evidence itself, you know, that all you have to do is look at the structure of the Episcopal Church and history of the Episcopal Church and it is a hierarchical church. No one is going to question the Episcopal Church is hierarchical before 2008." Mullin then testified in detail regarding the history of the Church.

¶ 21 However, on cross-examination, Mullin agreed his opinion the Church is hierarchical is not expressed in the Church's constitution. He also agreed neither the Church's constitution nor its canons specifically reference a three-tiered form of governance. Mullin further agreed the Church's constitution and canons do not prevent a diocese from withdrawing from the Church. Mullin was unaware of any attempt under Illinois law to remove the members of the Trustees from their offices. While Mullin testified the members of the Diocese forfeited their offices by leaving the Church, he could not point to the "magic moment" when they did so. He also agreed the Church cannot compel a diocese to contribute any money. Instead, the Church suggests what should be contributed. Historically, the lack of support from the dioceses has

been a "frequent problem." Mullin also admitted the Church's constitution and canons do not provide for the discipline of a diocese.

¶ 22    Dr. Jeremy Bonner, a specialist in Church history, testified for the Diocese. According to Bonner's testimony, the Church is "an extremely decentralized association" of state churches or dioceses. The Church's constitution lacks a supremacy clause and a mechanism to enforce its canons or legislation against a diocese. According to Bonner, the most striking characteristic of the Church is its lack of any supreme judiciary. During his testimony, the following colloquy took place:

"Q. In your opinion, can a religious organization which lacks a constitutionally established executive and judicial function which has no language of supremacy in its constitution function as an hierarchical church?

A. I do not see how.

Q. How can [the Church] then enforce its canons against a member diocese?

A. It can't. It can express its displeasure and can exert moral outrage and attempt to persuade its dioceses of the need to change, but recent disputes have shown the limitations of that strategy."

¶ 23    Bonner also testified he was unaware of any canon that purports to give the Church authority to assert control over a diocese's property. He explained while the so-called "Dennis Canon" (Title I.7.4) purports to declare a trust in parish property to restrict a parish's ability to dispose of it, that canon does not apply to property owned by a diocese.

¶ 24    Mark Gamage, the deputy chief credit manager and credit manager for National City for the past 30 years, testified for the Diocese. He had also served as trustee, treasurer, and president of the Trustees since 1988. According to Gamage's testimony, the Trustees have contracted with National City for the past 75 years. Gamage testified the Church had no involvement with National City during that time. The Church was also never a party to any contracts between National City and the Trustees. Gamage testified the "Discretionary Agency Agreement" is the current contract between National City and the Trustees. It was executed in 1999.

¶ 25    According to Gamage, the Trustees have always operated independently of the Church. The Church's permission was never sought nor required regarding, *inter alia*, the election or removal of any trustees, officers, or finance committee members. In addition, amendments to bylaws were made without permission from the Church because it was not required. The Church also had no involvement in how the income from the funds was distributed. Gamage testified the account statements were always sent to the Diocese and never to the Church.

¶ 26    On cross-examination, Gamage testified the Church "may" have been involved in raising money for 3 of the 38 funds. However, no further testimony was elicited regarding how or how much of the money in those funds was generated by the Church. Gamage then reasserted the Church was not involved in how the money in any of the 38 funds was invested or distributed.

¶ 27    On September 9, 2013, the trial court issued its very detailed 21-page "Findings, Opinion and Order." The court concluded the Church's authority over the Diocese could not be constitutionally determined without an impermissible investigation into church polity. The court reasoned the Diocese's subordinate status was "not clear or readily apparent." As a result, the court found the deference and declaratory relief the Church sought could not be legally enforced.

¶ 28    Instead, the trial court applied a neutral-principles-of-law analysis and found the Diocese "met its burden of proof, in its case in chief, that it has title and ownership of the accounts and deed titled in the Trustees." According to the court, nothing within the four corners of the Discretionary Agency Agreement suggested any interest by the Church in the funds held by National City. The court stated the Church "is clearly not a party to the agreement and not identified as a beneficiary of the agreement" and "no one from [the Church] had written authority with respect to the account." The court noted unrebutted evidence established the Church was never involved in any deposits, withdrawals, use, or administration of the account. The court also found nothing to suggest an express or implied trust had been created in favor of the Church. In sum, the court granted the Diocese's complaint for declaratory judgment and denied the Church's counterclaim for declaratory relief.

¶ 29    On October 9, 2013, the trial court issued its "Final Order and Judgment," which reiterated its findings.

¶ 30    This timely appeal by defendant-counterplaintiff the Church and counterplaintiff in intervention the Episcopal Diocese followed.

## II. ANALYSIS

¶ 32    On appeal, the Church argues the trial court erred (1) in failing to defer to and enforce the Church's determination the Diocese had no power to withdraw from the Church, (2) in concluding it had no authority to enforce the Church's determination as to the identity of the true diocesan leaders, and (3) by failing to enforce commitments between the Church and the Diocese regarding diocesan property.

## A. Motion Taken With the Case

¶ 34    On January 23, 2014, the Church filed a motion to substitute party with this court. In its motion, the Church requested "the Diocese of Chicago" be substituted for "the Diocese of Quincy of the Episcopal Church" as appellant. According to the motion, the congregations of the Episcopal Diocese had merged into the Diocese of Chicago and, as a result, the Episcopal Diocese no longer exists. We ordered that motion taken with the case. For the following reasons, we deny the Church's motion.

¶ 35    On October 9, 2013, the Church filed the same motion to substitute party with the trial court. On October 10, 2013, the trial court denied that motion. The Church filed its notice of appeal on October 15, 2013. While that notice of appeal referenced the court's October 10, 2013, order, it addressed only the court's denial of the Church's motion to stay enforcement of judgment. Illinois Supreme Court Rule 303(b)(2) (eff. June 4, 2008) requires the notice of appeal to "specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." A notice of appeal confers jurisdiction on a court of review to consider only the judgments specified in the notice of appeal. *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 433, 394 N.E.2d 380, 382 (1979). The appellate court does not acquire jurisdiction to review other judgments not specified in the notice of appeal. *Neiman v. Economy Preferred Insurance Co.*, 357 Ill. App. 3d 786, 790, 829 N.E.2d 907, 911 (2005). Here, no claim of error as to the trial court's ruling on the motion to substitute party was included in the notice of appeal. Filing that motion anew with this court is not a substitute for including its denial as a claim of error in the notice of appeal. As such, this court is without

jurisdiction to decide the matter. See *Long v. Soderquist*, 126 Ill. App. 3d 1059, 1062, 467 N.E.2d 1153, 1155 (1984).

¶ 36                                     B. Standard of Review

¶ 37     The Church argues all issues should be decided using the *de novo* standard of review because none of the testimony presented involved disputed facts. The Diocese, on the other hand, advocates for a manifest-weight-of-the-evidence standard. We agree with the Diocese.

¶ 38     The standard of review in a bench trial is whether the trial court's judgment is against the manifest weight of the evidence. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859, 893 N.E.2d 981, 991 (2008). "A reviewing court will not substitute its judgment for that of the trial court in a bench trial unless the judgment is against the manifest weight of the evidence." *Chicago's Pizza*, 384 Ill. App. 3d at 859, 893 N.E.2d at 991 (citing *First Baptist Church v. Toll Highway Authority*, 301 Ill. App. 3d 533, 542, 703 N.E.2d 978, 984 (1998)). " '[A] reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the trier of fact.' " *Emigrant Mortgage Co. v. Chicago Financial Services, Inc.*, 386 Ill. App. 3d 21, 26, 898 N.E.2d 1069, 1074 (2007) (quoting *In re Application of the County Treasurer*, 131 Ill. 2d 541, 549, 546 N.E.2d 506, 510 (1989)). A judgment is against the manifest weight of the evidence only if the opposite conclusion is apparent or if it appears to be arbitrary, unreasonable, or not based on the evidence. *Green v. Papa*, 2014 IL App (5th) 130029, ¶ 32, 4 N.E.3d 607.

¶ 39     Contrary to the Church's position, this is not a "documents only" case. In addition to reviewing numerous exhibits, the trial court heard an extensive amount of conflicting testimony and argument from the parties and made factual findings therefrom. Although determining whether to apply a deference or neutral-principles approach may, on its face, appear to be strictly a question of law, the court had to weigh the evidence presented in doing so. As the trier of fact, the trial judge was in a superior position to judge the credibility of the witnesses and determine the weight to be given to their testimony. *Buckner v. Causey*, 311 Ill. App. 3d 139, 144, 724 N.E.2d 95, 100 (1999). When contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent. *Buckner*, 311 Ill. App. 3d at 144, 724 N.E.2d at 100.

¶ 40                                 C. Deference and Neutral Principles

¶ 41     The first amendment to the United States Constitution provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ***." U.S. Const., amend. I. That clause "severely circumscribes the role that civil courts may play in resolving church property disputes" (*Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969)) and prohibits courts from inquiring into ecclesiastical questions. *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich*, 426 U.S. 696, 713 (1976). The Illinois Constitution contains a similar protection. See Ill. Const. 1970, art. I, § 3.

¶ 42     In *Watson v. Jones*, 80 U.S. 679, 727 (1871), the United States Supreme Court held "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have

been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." This has become known as the deference approach. A court applying the deference approach must defer to church hierarchy in the resolution of any ecclesiastical matter. *Watson*, 80 U.S. at 727; *Jones v. Wolf*, 443 U.S. 595, 602 (1979) (first amendment requires civil courts to defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization).

¶ 43       Accordingly, Illinois courts have generally refused to adjudicate cases requiring judicial interpretation of religious doctrine or church law where the governance structure is clearly hierarchical and the local group is clearly subordinate to the larger organization. *Stepek v. Doe*, 392 Ill. App. 3d 739, 754, 910 N.E.2d 655, 668 (2009); see, *e.g.*, *Williams v. Palmer*, 177 Ill. App. 3d 799, 805, 532 N.E.2d 1061, 1065 (1988) (appointment of ministers is "undoubtedly an ecclesiastical matter to which judicial deference is mandated"). However, where the question to be decided is not ecclesiastical, deference to religious authority is not required and the court may choose to employ another approach to resolve the dispute. *Hines v. Turley*, 246 Ill. App. 3d 405, 418, 615 N.E.2d 1251, 1259 (1993); *St. Mark Coptic Orthodox Church v. Tanios*, 213 Ill. App. 3d 700, 713, 572 N.E.2d 283, 291 (1991). Although state courts are not bound to follow a particular method of resolving these types of controversies, they are required to avoid considering doctrinal matters in doing so. *Jones*, 443 U.S. at 602.

¶ 44       Illinois courts have adopted the neutral-principles approach, whereby a court may objectively examine pertinent church characteristics, constitutions and bylaws, deeds, state statutes, and other evidence to resolve the matter as it would a secular dispute. *Stepek*, 392 Ill. App. 3d at 755, 910 N.E.2d at 668 (citing *Hines*, 246 Ill. App. 3d at 418, 615 N.E.2d at 1259). In *Jones*, the United States Supreme Court approved the neutral-principles methodology as a constitutionally permissible way to resolve church property disputes. *Jones*, 443 U.S. at 604 (states are constitutionally entitled to adopt a neutral-principles-of-law analysis). As a result, a court may decide whether disputed property belongs to the local church or general church by reference to " 'objective, well-established concepts of trust and property law.' " *Aglikin v. Kovacheff*, 163 Ill. App. 3d 426, 432, 516 N.E.2d 704, 708 (1987) (quoting *Jones*, 443 U.S. at 603).

¶ 45       This approach may be applied in resolving property disputes, even within a hierarchical church organization, so long as the court need not decide a religious matter involving church doctrine, polity, or practice. *Clay v. Illinois District Council of the Assemblies of God Church*, 275 Ill. App. 3d 971, 976-77, 657 N.E.2d 688, 692 (1995); *In re Marriage of Goldman*, 196 Ill. App. 3d 785, 793-95, 554 N.E.2d 1016, 1022-23 (1990) (courts must apply neutral principles of secular law to avoid excessive entanglement with religious doctrine). Simply put, if the analysis can be done in secular terms, the court should do so.

¶ 46       In this case, much, if not most, of the 15,000-page record on appeal deals with the Church's structure, history, and polity. Citing this record, the Church argues we should determine it is hierarchical, apply a deference approach, and defer to it in (1) affirming the identity of the true diocesan leaders, (2) determining the Diocese had no power to withdraw from the Church, and (3) enforcing commitments between the Church and the Diocese regarding the disputed property. See *St. Mark*, 213 Ill. App. 3d at 713, 572 N.E.2d at 291 ("where hierarchical religious organizations have established their own rules and regulations for internal discipline and government and have created tribunals for adjudicating disputes concerning the

government and direction of subordinate bodies, civil courts are required under the first and fourteenth amendments to defer to decisions of such tribunals").

¶ 47 However, the deference approach is unavailable where the determination of a church's hierarchical structure is not easily discernible. See *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 369-70 (1970) (deference approach is permissible only where the governing church body can be determined without extensive inquiry into religious policy). Here, the trial court declined to apply a deference approach, concluding it could not "constitutionally determine the highest judicatory authority or the locus of control regarding the property dispute to which it would be required to defer." The court's conclusion is not against the manifest weight of the evidence.

¶ 48 A review of the evidence presented in this case, including testimony from Dr. Mullin, the Church's own witness, does not clearly demonstrate the existence of a hierarchical relationship between the Diocese and the Church. Indeed, the Church's authority is not readily ascertainable without an impermissible investigation into matters of polity. Moreover, the central matter underlying the parties' dispute is: "who owns the disputed property." Determining whether the Diocese could leave the Church or identifying the leaders of the continuing diocese is unnecessary for purposes of answering that question. Again, such determinations would necessarily involve an extensive inquiry into church polity. With regard to the issue of the disputed property, however, we agree with the trial court it can be resolved by applying neutral principles of law.

¶ 49 As stated, courts applying a neutral-principles approach objectively examine, *inter alia*, contracts, bylaws, deeds, and statutes. *Stepek*, 392 Ill. App. 3d at 755, 910 N.E.2d at 668. We understand the Church's argument to be its identification of the leaders of the continuing faction of the Episcopal Diocese disposes of the property-ownership question. That argument is predicated on the Church's determination the Diocese did not have a right to the property other than to hold it in trust for the Church and the Episcopal Diocese. However, under the neutral-principles-of-law approach, the Church's determination is not entitled to deference.

¶ 50 The property in question in this case consists of the funds in the National City account and, although not emphasized by the Church on appeal, a deed to a piece of real property referred to by the Diocese as the "Diocesan House." The deed has been included in the record on appeal. It is undisputed the Church is not a party to the deed. Instead, the deed reflects title to the property is held by the Trustees. The language of the deed does not provide for an express trust in favor of the Church. The "Discretionary Agency Agreement," which is the contract between the Trustees and National City, is also contained in the record on appeal. Like the deed, it is undisputed the Church is not a party to that agreement. A review of the agreement does not indicate otherwise. It is also undisputed the Church has never had *any* involvement with the account, *i.e.*, it never made any deposits or withdrawals, never authorized distributions, and never exercised any type of control over the account at all. In fact, in its brief on appeal before this court, the Church clearly states it "has never asserted that it owns those funds or any of the Diocese's assets, but rather has consistently asserted that they belong in the hands of the Episcopalians who are the proper leaders of the Diocese." This is no small concession.

¶ 51 The Church also fails to cite any relevant legal authority to support the removal and substitution of the diocesan corporations' directors. Instead, it emphasizes the provisions of the Religious Corporation Act (805 ILCS 110/0.01 to 51 (West 2012)), which imposes certain requirements on the incorporating body with regard to trustee membership. See, *e.g.*, 805 ILCS

110/46d (West 2012) (a trustee may be removed from office for, *inter alia*, abandonment of the denomination). However, it is undisputed the diocesan corporations were not organized under the Religious Corporation Act. Thus, its requirements have no application here.

¶ 52 Moreover, Dr. Mullin, the Church's own witness, testified he knew of nothing to prevent a diocese from incorporating. Indeed, the Church does not argue the Diocese could not incorporate or was required to do so under the Religious Corporation Act. See 805 ILCS 110/35 (West 2012) (organizations formed for the purpose of religious worship *may* become incorporated under the Religious Corporation Act). In fact, religious organizations in Illinois may incorporate under *either* the Religious Corporation Act or the General Not For Profit Corporation Act of 1986 (Not-for-Profit Act) (805 ILCS 105/103.05(a)(8) (West 2012)). While the Not-for-Profit Act provides for the removal of corporate directors, the Church did not attempt any such removal under that act. See 805 ILCS 105/108.35 (West 2012); *People ex rel. Muhammad v. Muhammad-Rahmah*, 289 Ill. App. 3d 740, 742-43, 682 N.E.2d 336, 338 (1997). (In fairness, it likely lacked any authority or standing with which to do so as it is not a member of either the Trustees or Diocese of Quincy corporations.)

¶ 53 The trial court also found the evidence did not demonstrate the funds were held by National City in trust for the Church. The neutral-principles approach can involve examination of religious documents such as a church constitution for language of a trust in favor of the central church. *Jones*, 443 U.S. at 604; *Maryland & Virginia Eldership of the Churches of God*, 396 U.S. at 368 (Brennan, J., concurring, joined by Douglas and Marshall, JJ.). Under a neutral-principles analysis:

> "the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form." *Jones*, 443 U.S. at 606.

¶ 54 An examination of the evidence reveals nothing to demonstrate an express trust, an implied trust, or any other interest vested in the Church. As stated, neither the deed nor the Discretionary Agency Agreement provides for an express trust in favor of the Church. Further, our review of the Diocese's constitution and canons does not suggest diocesan assets were ever impliedly held in trust for the Church. After *Jones*, the Church adopted a trust canon (Title I.7.4, referred to by the parties as the Dennis Canon). That canon provides *parish* property is held in trust for the Diocese and Church and restricts a parish's ability to dispose of its property. However, it appears undisputed the Church's canons do not contain similar language with respect to diocesan property being held in favor of the Church. In addition, Bonner testified the Dennis Canon does not apply to property owned by a diocese. Our review of the record reveals nothing to suggest the opposite conclusion. Accordingly, the trial court's findings in this regard are not against the manifest weight of the evidence.

¶ 55 In sum, the evidence presented demonstrates title to the funds and real property lies with the Diocese. Following our review of the record, we cannot say the trial court's findings were arbitrary, unreasonable, or not otherwise based on the evidence. Nor can we say the opposite

conclusion is clearly apparent in this case. As a result, the court did not err in finding in favor of the Diocese. We commend the trial court for its detailed order, which we found quite helpful in reviewing this matter.

¶ 56                                    III. CONCLUSION

¶ 57        For the reasons stated, we affirm the trial court's judgment and deny the Church's motion to substitute party.

¶ 58        Affirmed; motion denied.