Modified opinion filed June 30, 2016.

2016 IL App (4th) 150193

NO. 4-15-0193

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE DIOCESE OF QUINCY, a Not-for-Profit Corporation; and THE TRUSTEES OF FUNDS AND PROPERTY OF THE DIOCESE OF QUINCY, | ) ) ) | Appeal from Circuit Court of Adams County |
| Plaintiffs-Appellees, | ) | No. 09MR31 |
| v. | ) | |
| THE EPISCOPAL CHURCH; and NATIONAL CITY BANK, n/k/a PNC BANK, N.A., | ) ) | |
| Defendants | ) | |
| (The Episcopal Church, Defendant and Counterplaintiff-Appellant; Diocese of Chicago, as Successor by Merger to the Diocese of Quincy of the Episcopal Church, Counterplaintiff-in-Intervention-Appellant; and Edward A. den Blaawen, Chris Potthoff, Leah Day, LeRoy Groff, Frank Dunaway, Mark L. Gamage, Bryce Dexter, Michael S. Brooks, Linda Terlesky, Warren Wilkins, Ronald R. Damewood, Jr., Nell German, Oscar P. Seara, Andrew Ainley, Kathi King, Ramsey Easterling, and Alberto Morales, Counterdefendants-Appellees). | ) ) ) ) ) ) ) ) ) ) ) ) | Honorable Mark A. Drummond, Judge Presiding. |

_____

JUSTICE POPE delivered the judgment of the court, with opinion.
Presiding Justice Knecht and Justice Holder White concurred in the judgment and opinion.

## OPINION

¶ 1     Defendant-counterplaintiff, the Episcopal Church, and counterplaintiff-in-intervention, the Diocese of Quincy of the Episcopal Church (Episcopal Diocese), n/k/a the Diocese of Chicago (collectively, the Church), appeal the trial court's order granting a motion to enforce a prior judgment filed by plaintiffs, the Diocese of Quincy (Diocese) and the Trustees of

Funds and Property of the Diocese of Quincy (Trustees), and counterdefendants, Edward A. Den Blaauwen, Chris Potthoff, Leah Day, Le Roy Groff, Frank Dunaway, Mark L. Gamage, Bryce Dexter, Michael S. Brooks, Linda Terlesky, Warren Wilkins, Ronald R. Damewood, Jr., Nell German, Oscar P. Seara, Andrew Ainley, Kathi King, Ramsey Easterling, and Alberto Morales. The Church also appeals the trial court's award of sanctions pursuant to Illinois Supreme Court Rule 137 (eff. July 1, 2013). We affirm in part and reverse in part.

¶ 2                                    I. BACKGROUND

¶ 3        The Church is an unincorporated association created in 1789 and headquartered in New York. In 1877, the Diocese was formed. In 1893, the Diocese formed an Illinois not-for-profit corporation, *i.e.*, the Trustees. The Trustees hold, manage, and distribute the Diocese's funds.

¶ 4        Over the years a doctrinal controversy developed, which resulted in a schism between the Diocese and the Church. In November 2008, the Diocese amended its constitution and annulled its accession to the Church's constitution and canons. The Diocese voted to withdraw from the Church and enter into membership with the Anglican Church of the Southern Cone.

¶ 5        On January 9, 2009, the Church contacted defendant, National City Bank, n/k/a PNC Bank (National City), and informed it a disagreement had arisen over the ownership of funds (amounting to several million dollars) deposited with National City by the Diocese (testimony indicated as of December 31, 2012, National City was holding approximately $3,579,778 for the Diocese). According to the Church, it had an "enforceable interest in ensuring that all property of the Diocese, its parishes, missions, foundations, and other related

- 2 -

institutions are held and used for the mission of the Church" and the Episcopal Diocese, which was created by the Church from the remaining loyal Episcopalians. Specifically, the Church wrote the following:

> "We understand that [National City is] the Custodian of the Diocese's Endowment Funds. This letter is to inform you that a disagreement has arisen over the proper ownership of these funds. A faction within the Diocese purports to have removed the Diocese from the Episcopal Church, and claims to own these funds. The Episcopal Church takes a contrary view, which is that the funds continue to be owned by the Diocese which remains a subordinate part of the Episcopal Church, and must be used solely for the mission of the Church and the subordinate Diocese. ***
>
> The Episcopal Church shall therefore hold [National City] in your role as Custodian of the Diocese's Endowment Funds accountable for any dispositions made by you of such funds at the direction of any of the above listed persons or anyone else on their behalf."

In response, National City froze the funds pending the resolution of the matter.

¶ 6 On March 30, 2009, the Diocese filed a complaint for declaratory judgment, seeking a determination it owned the funds. Specifically, the Diocese requested the court "adjudicate the rights and liabilities of the parties hereto with respect to the funds, money and accounts which are the subject of this action."

¶ 7        On May 22, 2009, the Church filed a motion to transfer venue to Peoria County, which the trial court denied.

¶ 8        On March 3, 2010, the Church filed an amended counterclaim seeking declaratory and injunctive relief against the Diocese's directors and trustees, requesting, *inter alia*, (1) a declaration "that all property held by or for the Episcopal Diocese is held for and may be used only for the mission of the Church and the Episcopal Diocese," (2) a declaration certain members of the Diocese are not the directors of the Trustees' corporation, (3) an injunction ordering the Diocese to relinquish control of the Trustees' corporation to the individuals the Church recognizes as the proper directors of those corporations, and (4) an accounting of all property held by those corporations.

¶ 9        Following a three-week bench trial before Judge Thomas J. Ortbal, the trial court issued its "Final Order and Judgment" on October 9, 2013.  The court, applying a neutral-principles-of-law analysis, found, *inter alia*, the following:

> "17. [The Church] is not a party to, nor a named beneficiary
> of, the Discretionary Agency Agreement between the [Diocese] and
> [National City].  That contract is the controlling document regarding
> the funds, money, endowments[,] and accounts in dispute.
>
> 18. The agreement does not suggest that [the Church] has
> any interest or other proprietary interest in the assets in this account.
>
> 19. No one from [the Church] had written authority with
> respect to the account.

20. [The Church] has never made deposits to, withdrawals from, used or administered this account.

21. There is nothing within the four corners of [the Discretionary Agency Agreement] which would suggest any trust or other proprietary interest of [the Church] in the assets held pursuant to that Agreement."

The court then held "all disputed funds, money, endowments[,] and accounts held by [National City] are hereby declared to be owned by [the Diocese] without any claim by [the Church]."

¶ 10        On October 15, 2013, the Church filed its notice of appeal.  (Enforcement of the trial court's judgment was stayed pending appeal.)

¶ 11        On November 6, 2013, while the matter was pending before the appellate court, the Church filed a complaint for declaratory and injunctive relief in Peoria County (Peoria County case No. 13-MR-582).  The complaint was virtually identical to the counterclaim it filed in the Adams County litigation.  In its prayer for relief, the Church requested, *inter alia*, (1) a declaration "that all property held by the Parishes of the Episcopal Diocese is held for and may only be used for the mission of the Church and the Episcopal Diocese," (2) a declaration certain members of the Diocese are not the directors of the Trustees' corporation, (3) an injunction ordering the Diocese to relinquish control of the Trustees' corporation to the individuals the Church recognizes as the proper directors of those corporations, and (4) an accounting of all property held by those corporations and other entities controlled by the Diocese.  As stated, the Trustees hold, manage, and distribute the Diocese's funds located in the National City account. (The Peoria proceedings have since been stayed pending the outcome of the instant appeal.)

¶ 12        On July 24, 2014, we affirmed the trial court's judgment, finding, *inter alia*, the following:

> "The property in question in this case consists of the funds in the National City account and, although not emphasized by the Church on appeal, a deed to a piece of real property referred to by the Diocese as the 'Diocesan House.'  The deed has been included in the record on appeal.  It is undisputed the Church is not a party to the deed.  Instead, the deed reflects title to the property is held by the Trustees.  The language of the deed does not provide for an express trust in favor of the Church.  The 'Discretionary Agency Agreement,' which is the contract between the Trustees and National City, is also contained in the record on appeal.  Like the deed, it is undisputed the Church is not a party to that agreement.  A review of the agreement does not indicate otherwise.  It is also undisputed the Church has never had any involvement with the account, *i.e.*, it never made any deposits or withdrawals, never authorized distributions, and never exercised any type of control over the account at all.  In fact, in its brief on appeal before this court, the Church clearly states it 'has never asserted that it owns those funds or any of the Diocese's assets, but rather has consistently asserted that they belong in the hands of the Episcopalians who are the proper leaders of the Diocese.'  This is no small concession."  (Emphasis omitted.)  *Diocese of Quincy v.*

*Episcopal Church*, 2014 IL App (4th) 130901, ¶ 50, 14 N.E.3d 1245.

¶ 13 Thereafter, the Church filed a petition for leave to appeal to the Illinois Supreme Court. On November 26, 2014, the supreme court denied the Church's petition (*Diocese of Quincy v. Episcopal Church*, No. 118186 (Ill. Nov. 26, 2014) (table)). The mandate was set to issue on December 31, 2014.

¶ 14 On December 30, 2014, one day before the mandate was to issue, the Church sent a letter to National City. That letter was substantially similar to the one previously sent in the original Adams County case. The second letter stated the following:

 "We [represent the Church] in litigation involving a Complaint for Declaratory and Injunctive Relief and pending as Case No. 13-MR-582 in *** Peoria County. The suit involves, among other matters, the disputed ownership of property of certain missions and parishes that have left [the Church]. Some of that property is held and managed by [National City] under a Discretionary Agency Agreement between [National Bank] and [the Trustees].

 I am enclosing for your reference a Summary of Funds held at [National City] as of December 31, 2012. This is the most recent accounting in our possession. As you can see[,] of the 38 funds held and managed at [National City], 17 are designated as funds held for 'Missions and Parishes' totaling as of December 31, 2012, $774,599. Those funds of 'Missions and Parishes' presently remain at [National Bank] and are part of the subject matter of the Peoria County

litigation referenced above.

In the Peoria County suit our clients, [the Church] maintain and allege that all property of the Missions and Parishes, including those funds held at [National City], are held and may only be used for the mission and benefit of our clients. One of the prayers for relief requested of the court in [that] litigation is for a permanent injunction ordering the defendants to relinquish control of the 'Trustees of Funds and Property of the Diocese of Quincy and all property held by those corporations for any of the Parishes and Missions of the Episcopal Diocese...'

Given the foregoing dispute as to ownership of the 'Mission and Parish' funds presently in litigation in Peoria County, demand is hereby made that [National City] freeze and refuse to disburse any of the funds held by it for 'Missions and Parishes' and, further, that a current accounting be provided with respect to those funds.

In the event it is adjudicated that these funds are the property of our clients and said funds are disbursed prior to such adjudication, we may have no alternative but to look to [National City] for recovery of the amount of any such disbursed funds.

With respect to the foregoing, please be advised that this demand relates only to the funds of 'Missions and Parishes' at [National City] and not the balance of the funds which were the

subject of a prior suit and litigation in Adams County, Quincy,

Illinois, which has concluded."

¶ 15    National City informed the Church the funds were commingled in a single account and National City had not designated any of the funds for mission and parish purposes. However, citing the threat from the Church to look to it for recovery of the funds, National City again froze the entire account and refused to release any of the funds to the Diocese pending further court order.

¶ 16    On February 10, 2015, the Diocese filed an "Amended Motion to Enforce Judgment and for Sanctions" with the Adams County circuit court. The Diocese requested the trial court enter an order to enforce the trial court's 2013 judgment in the original action. According to the Diocese, the prior Adams County lawsuit involved a dispute over all the funds held in a single National City account. That account contained 39 funds, which were summarized in trial exhibits stipulated to by the Church and described during trial testimony by Mark Gamage, the deputy chief credit manager and credit manager for National City. The Diocese argued, because the trial court held the Church lacked any interest in the funds in the account, the Church's Peoria County claim to 18% of the funds in the National City account "is contrary to, in violation of, and an improper collateral attack on the trial court and appellate court decisions." (We note the parties agree the Church is seeking 18% of the funds in the National City account.)

¶ 17    During the February 17, 2015, hearing on the Diocese's motion before Judge Mark Drummond (Judge Ortbal had retired), the Diocese argued the Adams County litigation had already adjudicated ownership and title to 100% of the funds in the National City account. The

Diocese pointed out the trial court's order, which this court affirmed, held the Church had no interest whatsoever in the National City bank account. The Diocese maintained the Church's current position was therefore wholly inconsistent with the court's final judgment.

¶ 18        The Church denied violating the trial court's order by sending the letter to National City. According to the Church, National City "is the one that chose to freeze the account, not [the Church]." The Church maintained although it lost, the Adams County trial court only adjudicated it had no interest in the account with regard to diocesan property. The Church argued the question of whether it had any interest in the funds held for parishes and missions was a "different animal" than what was decided in the Adams County case. The following exchange then took place between the trial court and counsel for the Church:

"THE COURT: Where does it say that [in] Judge Ortbal's order? Where does it say that?

[COUNSEL]: It does not say that explicitly, Your Honor, but when looking, I cite—

THE COURT: Wouldn't it have to say that explicitly?

[COUNSEL]: No, Your Honor, because the subject matter of [that] case was diocesan property.

THE COURT: And wouldn't—if there's a mistake in Judge Ortbal's order, wouldn't you have to bring a motion to correct that?

[COUNSEL]: If there was a mistake, Your Honor.

THE COURT: Well, aren't you saying there was a mistake? It's not in there.

[COUNSEL]: I'm not saying that there was a mistake, Your Honor. What was adjudicated was diocesan—my client's interest in diocesan property."

¶ 19    During the hearing, the Church admitted "the whole [National City] account was at issue in the adjudication." The Church stated, "it was our claim that [the] entire account was made up of diocesan property, and we had an interest in it." According to the Church, it made the arguments regarding the entire account "because it believed *** that the entire account was titled in the name of the diocesan property and it had an interest in that." However, the Church maintained, "[we] didn't prevail, but that did not adjudicate the issue as to whether the diocese is holding any funds in that account for the benefit of parishes and missions, [and] what interest [we had] in that." The Church explained, "[i]t is an issue that needs to be litigated in Peoria County because it was never litigated in Adams County."

¶ 20    At the conclusion of the hearing, the trial court found in favor of the Diocese and stated the following:

"The court's considered the pleadings and the arguments. I am not confused. This is a very simple issue.

The court finds [the Church] is attempting to grasp victory from the jaws of defeat. Judge Ortbal's order is clear. Paragraph A, quote: [']that the Diocese House and any and all disputed funds, money, endowments[,] and accounts held by [National City] are hereby declared to be owned by the [Diocese] without any claim by the [the Church].[']

- 11 -

In addition, Paragraph C:  [']that all requests by [the Church] for declaration, injunctive relief and accountings are hereby denied.[']

So it appears [the Church] comes in after the fact and says: [']Well, if we can't get the whole 100 percent, we want the 18 percent.[']  So if *** the issue that was litigated back then was this distinction between diocesan versus parish and mission property when Judge Ortbal entered this order on October 9th, 2013, within 30 days [the Church] should have come in and said:  [']Hey judge, this order is wrong.  You've got to correct this.  You've got to designate diocesan versus parish—parish and missions,['] and they didn't do that.

* * *

[The Church] did not bring this up before Judge Ortbal, did not bring this up before the appellate court, and the issue in this case, I'm satisfied, was the entire account at [National City].

If [the Church] wished to tease away a certain amount, then they should have given the trial court the ability to do that, perhaps raised on appeal, and that was simply not done.

It appears to me Judge Ortbal's order is clear.  This is the entire account.  Any claim by [the Church] for [a] declaration, injunctive relief[,] or [an] accounting *** was denied.

If they felt that Judge Ortbal's order was in error, they should

have filed a motion to correct that so Judge Ortbal could have addressed that issue. I believe they—they've waived that.

I find [the Church's] position in this case to be so lacking in merit that I am assessing sanctions in this case."

¶ 21　　On February, 20, 2015, the trial court entered its written order. In it, the court granted the Diocese's request for attorney fees incurred from December 30, 2014, onward "pursuant to Supreme Court Rule 137." The court also ordered the following:

"A. The Judgment in favor of the [Diocese] is hereby enforced pursuant to [Illinois] Supreme Court Rule 369(b) [(eff. July 1, 1982) (after a reviewing court affirms a judgment, jurisdiction revests in the trial court to enforce the judgment and for other proceedings to go on as if no appeal had been taken)];

B. [The Church is] hereby directed and ordered to cease and desist in any attempts to prevent the distribution of, or claim any ownership in or interest to, any of the funds in the single account held by [National City] for [the Diocese];

C. [The Church is] hereby directed and ordered to cease and desist in any attempts to request the Circuit Court of Peoria County or any other jurisdiction to modify or overrule the Illinois Fourth District Appellate Court or the final judgment rendered [in] the above-entitled cause;

D. [The Church is] hereby directed and ordered to cease

- 13 -

and desist in any attempts to collaterally attack the final judgment in the above-entitled cause; [and]

E. [The Church is] hereby directed and ordered to pay any and all attorney's fees incurred by [the Diocese] from December 30, 2014[,] forward regarding [the Church's] purported claim of any ownership interest in or to any of the funds held in the single account by [National City]."

¶ 22    This appeal followed.

¶ 23                                II. ANALYSIS

¶ 24    On appeal, the Church argues the trial court erred in (1) granting the Diocese's motion to enforce where it improperly expanded the scope of the original order to cover a dispute not previously litigated and (2) awarding sanctions pursuant to Illinois Supreme Court Rule 137 (eff. July 1, 2013).

¶ 25    The Diocese argues the actions taken by the Church in Peoria County, including its threat to sue National City if it followed the trial court's order to release the funds to the Diocese, amounted to a sanctionable violation of the law-of-the-case doctrine.

¶ 26                            A. Motion To Enforce

¶ 27    The trial court's judgment in this case was based on its interpretation of its prior order. A trial court's construction of a prior order presents a question of law, which we review *de novo*. *In re Marriage of Avery*, 251 Ill. App. 3d 648, 652, 622 N.E.2d 1231, 1234 (1993); *In re Marriage of Thompson*, 357 Ill. App. 3d 854, 857, 829 N.E.2d 419, 421-22 (2005). We may affirm the trial court for any reason supported by the record, regardless of the particular basis

- 14 -

relied upon by the trial court. *Akemann v. Quinn*, 2014 IL App (4th) 130867, ¶ 21, 17 N.E.3d 223.

¶ 28  The law-of-the-case doctrine limits relitigation of a previously decided issue in the same case. *Village of Ringwood v. Foster*, 2013 IL App (2d) 111221, ¶ 33, 986 N.E.2d 662 (quoting *Krautsack v. Anderson*, 223 Ill. 2d 541, 552, 861 N.E.2d 633, 642 (2006)). Like other preclusion doctrines, such as *res judicata* and collateral estoppel, the law-of-the-case doctrine prevents a defendant from taking two bites out of the same apple. *People v. Tenner*, 206 Ill. 2d 381, 395, 794 N.E.2d 238, 247 (2002). The doctrine encompasses not only the reviewing court's explicit decisions, but those issues decided by necessary implication. *Reich v. Gendreau*, 308 Ill. App. 3d 825, 829, 721 N.E.2d 634, 637 (1999). There are two exceptions to the law-of-the-case doctrine: (1) if a higher reviewing court makes a contrary ruling on the same issue after the lower court's decision, or (2) if a reviewing court determines that its prior decision was palpably erroneous. *Radwill v. Manor Care of Westmont, IL, LLC*, 2013 IL App (2d) 120957, ¶ 10, 986 N.E.2d 765. Neither exception applies here.

¶ 29  Under the Illinois rule against claim-splitting, which is closely related to the doctrine of *res judicata*, a plaintiff is "not permitted to sue for part of a claim in one action and then sue for the remainder in another action." *Green v. Northwest Community Hospital*, 401 Ill. App. 3d 152, 154, 928 N.E.2d 550, 553 (2010) (a plaintiff cannot divide a cause of action in order to maintain separate lawsuits; instead a plaintiff must assert all the grounds of recovery he or she may have against the defendant arising from a single cause of action in one lawsuit). A party "cannot preserve the right to bring a second action after loss of the first merely by limiting the theories of recovery opened by the pleadings in the first action." *Best Coin-Op, Inc. v. Paul*

*F. Ilg Supply Co.*, 189 Ill. App. 3d 638, 657, 545 N.E.2d 481, 493 (1989) (citing *Prochotsky v. Union Central Life Insurance Co.*, 2 Ill. App. 3d 354, 356-57, 276 N.E.2d 388, 390 (1971)).

¶ 30    In this case, the Church's entire argument is predicated on its position the Adams County trial court's 2013 final judgment did not pertain to parish property, *i.e.*, it only applied to diocesan property, which it now maintains comprised only 82% of the funds in the National City account. In the Peoria litigation, the Church claims parish property held in the National City account, *i.e.*, 18% of the total amount of the funds, is subject to a trust in favor of the Church.

¶ 31    However, during the hearing before the trial court on the motion to enforce, the Church conceded the entire National City account was at issue in the Adams County case and it was its theory at the time 100% of the funds in that account belonged to it. Indeed, in affirming the trial court's order, this court stated, "The property in question in this case consists of the funds in the National City account ***." *Diocese of Quincy*, 2014 IL App (4th) 130901, ¶ 50, 14 N.E.3d 1245. In our opinion, we identified the amount of the disputed funds as $3,579,778, which was the estimated amount of *all of the funds* in the account, not 82% of the funds. See *Diocese of Quincy*, 2014 IL App (4th) 130901, ¶ 1, 14 N.E.3d 1245 ("testimony indicated as of December 31, 2012, National City was holding approximately $3,579,778 for the Diocese").

¶ 32    In its 2013 order, the Adams County trial court held "all disputed funds, money, endowments[,] and accounts held by [National City] are hereby declared to be owned by [the Diocese] without any claim by [the Church]." The court also found nothing to suggest "any trust or other proprietary interest" on the part of the Church in the assets held by National City. To now suggest in the Peoria County litigation 18% of the funds are subject to a trust in favor of the Church (for whatever reason) is clearly contrary to the original order.

¶ 33       Put simply, the trial court in the original Adams County action found the Church

had *no interest in any of the funds in the National City account*.  The Church did not file a

motion to reconsider or a motion to clarify to argue the court's judgment should apply to just

82% of the funds.  On appeal, we affirmed the trial court's judgment.  Thereafter, the supreme

court denied the Church's petition for leave to appeal.  As such, the issue has been settled as a

matter of law, and any relitigation is barred by the law-of-the case doctrine.

¶ 34       If the Church wished to advance its current theory of the case, it should have

argued in the alternative before the trial court and on appeal.  Instead, the Church chose to wait

until after the trial court rendered its final judgment to file a complaint in a different county

(located in a different appellate court district) advancing an alternative theory of recovery.

Under the circumstances of this case, it was improper for the Church to do so.  Accordingly, the

trial court's judgment granting the Diocese's motion to enforce is affirmed.

¶ 35                          B. Imposition of Rule 137 Sanctions

¶ 36       The Church argues the trial court's award of attorney fees as sanctions pursuant to

Illinois Supreme Court Rule 137 (eff. July 1, 2013) was improper because complained-of

conduct occurred outside of the trial court sanctioning the conduct.  According to the Church,

because the alleged frivolous filing was made in Peoria County, not Adams County, the Adams

County court was without authority to assess Rule 137 sanctions.

¶ 37       The decision whether to impose Rule 137 sanctions is a matter within the sound

discretion of the trial court and should not be disturbed absent an abuse of discretion.

*Sterdjevich v. RMK Management Corp.*, 343 Ill. App. 3d 1, 19, 796 N.E.2d 1146, 1160 (2003).

" 'A [trial] court exceeds its discretion only where no reasonable person would take the view

adopted by it.' " *Hess v. Loyd*, 2012 IL App (5th) 090059, ¶ 22, 964 N.E.2d 699 (quoting *Spiegel v. Hollywood Towers Condominium Ass'n*, 283 Ill. App. 3d 992, 1001, 671 N.E.2d 350, 357 (1996)).

¶ 38        Rule 137, entitled "Signing of Pleadings, Motions and Other Documents— Sanctions," provides, *inter alia*, every pleading or motion signed by the attorney of record constitutes a certificate by the attorney that (1) he read the pleading or motion, and (2) to the best of his or her knowledge, the pleading or motion is grounded in fact and warranted by existing law or a good-faith argument for the extension of existing law. Ill. S. Ct. R. 137(a) (eff. July 1, 2013). Sanctions for violating Rule 137 "may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion[,] or other document, including a reasonable attorney fee." Ill. S. Ct. R. 137(a) (eff. July 1, 2013). Subpart (b) of Rule 137, entitled, "Procedure for Alleging Violations of This Rule," provides, "All proceedings under this rule shall be brought within the civil action in which the pleading, motion[,] or other document referred to has been filed ***." Ill. S. Ct. R. 137(b) (eff. July 1, 2013).

¶ 39        The Diocese argues sanctions are appropriate because the Church's Peoria County actions demonstrated its willful disobedience of the 2013 Adams County court order. The Diocese maintains the Adams County trial court has a right to punish conduct intended to obstruct its administration of justice. While generally true, the application of that principle to this case presumes the trial court found the Church in contempt for violating the original judgment. Indeed, in its brief on appeal, the Diocese states the Church "was properly sanctioned by the [trial court] for its willful disobedience of the previous Orders and [the appellate court's]

- 18 -

Opinion. Any such finding of indirect civil contempt requires the existence of an Order of the Court and proof of willful disobedience of that Order." The cases cited by the Diocese in support of sanctions involve contempt proceedings. See, *e.g.*, *People v. Simac*, 161 Ill. 2d 297, 305, 641 N.E.2d 416, 420 (1994) (courts have the inherent power to punish contempt); *In re Estate of Steinfeld*, 158 Ill. 2d 1, 19, 630 N.E.2d 801, 810 (1994) (contempt finding was within the trial court's power to enter for the purpose of compelling compliance with a prior order); *People v. Gallinger*, 191 Ill. App. 3d 488, 490, 548 N.E.2d 78, 80 (1989) (contempt power of the trial court is a proper sanction). Here, however, the Diocese did not file a petition for an adjudication of contempt and the court made no such finding. Instead, sanctions were imposed pursuant to Rule 137.

¶ 40    Subpart (b) of Rule 137, entitled "Procedure for Alleging Violations of This Rule," provides, "All proceedings under this rule shall be brought within the civil action in which the pleading, motion[,] or other document referred to has been filed ***." Ill. S. Ct. R. 137(b) (eff. July 1, 2013). Because Rule 137 is penal in nature, it should be strictly construed. *Reyes v. Compass Health Care Plans*, 252 Ill. App. 3d 1072, 1078, 625 N.E.2d 246, 251 (1993). Thus, while the Diocese argues the demand letter sent to National City merited sanctions, it cannot reasonably be considered a court filing for Rule 137 purposes.

¶ 41    During oral argument in this case, counsel for the Diocese mistakenly represented the Church had attached pleadings from the Peoria County action, requesting the Peoria County court enjoin the enforcement of the Adams County court orders, to its response to the Diocese's motion to enforce in the Adams County case. Counsel then argued doing so effectively brought the complained-of pleadings from the Peoria County action into the Adams County case

sufficiently to justify sanctions by the Adams County trial court. This representation and argument also appeared in the Diocese's brief. Upon notification from the Church, however, we have discovered this was not the case. The complained-of pleading, *i.e.*, the complaint for declaratory and injunctive relief, was filed by the Church with the trial court in Peoria County. However, the Diocese filed the offending pleadings in Adams County as exhibit N, attached to its amended motion to enforce judgment and for sanctions. Thus, any sanctions should be sought in the context of the Peoria County proceeding. The trial court's award of sanctions is therefore reversed.

¶ 42                                   III. CONCLUSION

¶ 43          For the reasons stated, we affirm the trial court's judgment to grant the motion to enforce and reverse the court's judgment awarding sanctions.

¶ 44          Affirmed in part and reversed in part.