NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 230250-U

NO. 4-23-0250

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 11, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| BEHROUZ and JACKELIN AFRAMIAN FAMILY TRUST DATED JULY 1, 1999, as Beneficiary of Chicago Title Company, Trustee, | ) ) ) | Appeal from the Circuit Court of Stephenson County |
| Plaintiff-Appellant, | ) | No. 13CH25 |
| v. | ) | |
| FREEPORT RENAISAANCE LLC a/k/a FREEPORT RENAISSANCE, LLC, a Nevada limited liability company; E & E MORTGAGE BANKERS CORPORATION a/k/a E&E Mortgage Bankers Corp., a California corporation; JOSEF SARSHAR; DALIA SARSHAR; FREEPORT INDUSTRIAL ROOFING, INC., an Illinois corporation; RESTORX OF NORTHERN ILLINOIS, a division of Gitz-Meier Remodeling Contractor, Inc., an Illinois corporation; PCH USA 26, LLC, a California limited liability company; MARC MIRBOD; FARIBA ATIGHEHCHI; SHAHRAM ELYASZADEH; and unknown owners and non-record claimants, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | Honorable Glenn R. Schorsch, |
| (Fariba Atighehchi, Defendant-Appellee). | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Doherty and DeArmond concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court affirmed the trial court's judgment in favor of defendants after a bench trial because the judgment was not against the manifest weight of the evidence.

¶ 2 This case involves the foreclosure of a "hard money" loan, backed by a mortgage on Illinois real estate, originating in California between California residents. Plaintiff—the Behrouz and Jackelin Aframian Family Trust Dated July 1, 1999, as beneficiary of Chicago Title

Company, Trustee—seeks to recover a deficiency judgment against defendant Fariba Atighehchi, personally, based on a guaranty agreement. After the parties filed cross-motions for summary judgment and the trial court ruled in favor of Atighehchi, the Second District Appellate Court reversed and remanded, concluding that genuine issues of material fact were present on this record. *Behrouz & Jackelin Aframian Family Trust Dated July 1, 1999, v. Freeport Renaissance, LLC*, 2019 IL App (2d) 180404-U, ¶¶ 16-17, 31-33.

¶ 3        On remand, the trial court conducted a bench trial and entered judgment in favor of Atighehchi, concluding that plaintiff failed to meet its burden of proof to show that the facially ambiguous guaranty agreement was intended by the parties to be a personal guaranty.

¶ 4        The sole question for this court to resolve on appeal is whether the trial court's ruling was against the manifest weight of the evidence. We conclude it was not and affirm.

¶ 5                                    I. BACKGROUND

¶ 6        Given the complexity of this case and the issuance of the Second District's order earlier in this case, which provides a detailed background of this case prior to the trial on remand, we set forth the Second District's earlier decision to assist the reader in understanding the case because it is so well written. (We note that Atighehchi is the only defendant on appeal and the only defendant remaining in the case. Prior to the first appeal, the trial court entered judgment against all the named defendants except for Atighehchi and Elyaszadeh. On remand, the court entered judgment against Elyaszadeh following the bench trial, and Elyaszadeh is not a party to this appeal.) The Second District wrote the following:

"[A. The Facts Giving Rise to the Complaint]

The plaintiff, Behrouz and Jackelin Aframian Family Trust, dated July 1, 1999, filed this suit to enforce an alleged personal guarantee on a loan, executed by

- 2 -

the three members of *** Freeport Renaissance, LLC. The trial court entered summary judgment in favor of one of the members of Freeport Renaissance, Fariba Atighehchi, finding that the guarantee at issue in this case was a corporate guarantee and was not a personal guarantee from Atighehchi. The plaintiff appeal[ed] from that order. We reverse and remand for further proceedings.

***

Prior to 2010, 110 FM, LLC, purchased real property located at 1201-1287 West Galena Avenue in Freeport, commonly known as the Freeport Lincoln Mall. 110 FM was equally owned by the defendants, Marc Mirbod and Atighehchi. Atighehchi was a licensed real estate agent in California. Thereafter, Freeport Renaissance, a Nevada limited liability company, purchased the property from 110 FM, with a cash contribution from the defendant, Shahram Elyaszadeh, through his wholly owned company, PCH USA 26, LLC (PCH), a California limited liability company. As a result of the purchase, Freeport Renaissance was owned 50% by PCH, 25% by Mirbod, and 25% by Atighehchi. PCH was the manager of Freeport Renaissance. Atighehchi was responsible for the leasing at the property. At the time of these transactions, all the members of Freeport Renaissance lived in California.

In 2010, Elyaszadeh approached the plaintiff to obtain a loan. Elyaszadeh had procured loans from the plaintiff in the past. In previous loans, Elyaszadeh had signed personal guaranties in favor of the plaintiff. Elyaszadeh, through another company owned by him, E&E Mortgage Bankers, LLC, had his employee, Allen Santos, prepare the loan documents. Santos prepared four loan documents: a promissory note, a security agreement, a deed of trust, and a guarantee (hereinafter

'Guaranty').

The Guaranty defined guarantor in the introductory paragraph as 'Freeport Renaissance LLC, *** (collectively, the "Guarantor"').' The Guaranty also defined borrower in its recitals as Freeport Renaissance. The Guaranty indicated that [(1)] the plaintiff was considering making a loan to borrower, [(2)] that the guarantor desired that the plaintiff extend the loan, and [(3)] that the guarantor was executing the guarantee to induce the plaintiff to extend the loan to the borrower. In paragraph 7 of the Guaranty, any notice to the guarantor was to be sent to Freeport Renaissance at its business address. Paragraph 19a of the Guaranty provided that '[i]f more than one person has signed this Guaranty, it shall be the joint and several obligation of all such persons.' Paragraph 19b, indicated that 'the term "Guarantor" shall be deemed to refer to any one or both of the parties constituting Guarantor.' Paragraph 21 provided that:

> 'Each individual whose signature appears below represents and warrants to the other party that such individual has the full power, authority and legal right to execute the Guaranty for himself or herself (and/or for any legal entity on behalf of which he or she signs) and to perform all obligations on his, her or its part under this Guaranty.'

The Guaranty was signed by Elyaszadeh, as manager of PCH, and by Mirbod and Atighehchi as 'individuals.' The Guaranty was drafted in California and was signed by Elyaszadeh and Atighehchi in California, and provided that it was subject to California law. ***

The promissory note, dated November 1, 2010, reflected a $600,000 loan

- 4 -

that was to mature within one year. The maker was defined as Freeport Renaissance. The note was signed by Elyaszadeh, as manager of PCH, and by Mirbod and Atighehchi as 'individuals.' The security agreement, dated November 1, 2010, defined guarantor and borrower as Freeport Renaissance. It further provided that 'Borrower and Guarantor are sometimes individually and/or collectively referred to herein as "Debtor".' In paragraph 7a, it stated that the debtor was 'in the case of Guarantor, an individual whose residence is in Los Angeles.' The security agreement was signed by Elyaszadeh, as manager of PCH, and by Mirbod and Atighehchi as 'individuals.' The deed of trust, which transferred the deed for the Freeport Lincoln Mall to a trustee (Chicago Title Company) and named the plaintiff as beneficiary, was signed by Elyaszadeh as manager of PCH and as a member of Freeport Renaissance. Mirbod and Atighehchi both signed the deed of trust as members of Freeport Renaissance.

The documents were sent to the plaintiff on October 28, 2010. Prior to funding the loan, the plaintiff responded via email that it needed personal guarantee agreements from all the members of Freeport Renaissance. This response was sent to Elyaszadeh and copied to Santos. Santos responded as follows: 'Please be advised that the provided Guaranty Agreement is a "Blanket" personal guarantee with all three members guaranteeing the loan.' Nonetheless, the plaintiff required that Elyaszadeh sign a personal guarantee as an 'individual.' Thus, an additional guarantee agreement was drafted and signed by Elyaszadeh as an individual. The Elyaszadeh guarantee defined the guarantor as Elyaszadeh, individually. Additionally, as requested by the plaintiff, an addendum to the promissory note was

drafted and signed by Elyaszadeh as the managing member of Freeport Renaissance.

On November 18, 2010, the loan was funded. The defendants defaulted on the note by failing to pay all amounts due before the maturity date.

[B. The Trial Court Proceedings]

[1. *The Complaint*]

On February 13, 2013, the plaintiff filed a verified six-count complaint against Freeport Renaissance, PCH, Mirbod, Atighehchi, Elyaszadeh[, and other defendants that had interests or liens on the mortgaged property]. On October 29, 2013, the plaintiff filed an amended complaint to correct the legal description of the subject property. In its complaint the plaintiff sought foreclosure of the mortgage (count I) against all the defendants other than Elyaszadeh; collection on the personal guaranties from PCH, Mirbod, Atighehchi, and Elyaszadeh (counts II through V, respectively); and foreclosure on the security agreement against Freeport Renaissance, PCH, Mirbod and Atighehchi (count VI).

[2. *The Initial Motion for Summary Judgment and Judgment of Foreclosure*]

[a. The Judgment of Foreclosure]

On February 5, 2015, the plaintiff filed a motion for summary judgment. On May 18, 2015, a judgment of foreclosure was entered. The trial court found that the total amount due to the plaintiff was in excess of $2.4 million plus interest, costs, and attorney fees. The trial court entered a personal deficiency judgment against Freeport Renaissance and PCH, in an amount to be determined at the time of the confirmation of sale. The trial court also entered [judgments on counts I, II,

and VI against Freeport Renaissance, PCH, and the other defendants with interests or liens on the property]. Per the agreement of the parties, count VI was dismissed against Mirbod and Atighehchi. Elyaszadeh, Mirbod, and Atighehchi were reserved the right to challenge the judgment as it applied to them. Mirbod later settled out of court and count III was dismissed. Accordingly, count IV against Atighehchi and count V against Elyaszadeh remained pending on the motion for summary judgment and hearing was continued on those counts.

[b. The Evidence in Support of Summary Judgment]

In an August 4, 2016, discovery deposition, Elyaszadeh stated that he was a licensed real estate broker in California. He was the owner and sole shareholder of a company named E&E Mortgage Bankers, which provided financing for real estate transactions. His wife was the sole member and manager of Sunrise Financial, LLC. With respect to the loan from the plaintiff to Freeport Renaissance, Sunrise Financial was paid a $30,000 loan origination fee and Mortgage Bankers was compensated $1500 for preparation of the loan documents. Mortgage Bankers' employee, Allen Santos, prepared all the loan documents. Elyaszadeh stated that he discussed the terms of the loan with the other members of Freeport Renaissance and they all agreed to the terms.

In a February 17, 2017, discovery deposition, Santos stated that his supervisor at Mortgage Bankers was Elyaszadeh and everything Santos did, including drafting documents, was reviewed by Elyaszadeh. Santos further stated that, with regard to the Freeport Renaissance loan from the plaintiff, his understanding was that he was supposed to draft documents such that all three

members of Freeport Renaissance personally guaranteed the loan.

In a September 29, 2016, discovery deposition, Atighehchi stated that she had known Elyaszadeh for about 35 years because he was her father's friend. Elyaszadeh, Mirbod and she were all members of Freeport Renaissance. At some point, Freeport Renaissance had to borrow money to pay taxes and other bills. At that time, Elyaszadeh was managing Freeport Renaissance. Elyaszadeh negotiated the loan from the plaintiff. She had never met or talked to the plaintiff and never asked Elyaszadeh about the terms of the loan. Atighehchi acknowledged that she had agreed to get a loan from the plaintiff for Freeport Renaissance. She did not read the entire note before she signed it—she just looked at the first and last pages. She did not know who drafted the note. She acknowledged that she signed the deed of trust the same day as the note. She did not know who drafted it and did not review the document before she signed it. She acknowledged that she signed the deed of trust as a member of Freeport Renaissance. She also acknowledged that she signed the Guaranty in her individual capacity but stated that she believed the guarantor was Freeport Renaissance. She believed that the term 'an individual' next to her signature referred to the fact that she was an individual member of Freeport Renaissance. She stated that she never would have personally guaranteed the note.

In a July 18, 2016, video deposition, Behrouz Aframian testified that, prior to the loan at issue in this case, he had negotiated two other loans with Elyaszadeh. Both of those loans were personally guaranteed by Elyaszadeh even though Elyaszadeh was not the borrower. Elyaszadeh did all the legal work and paperwork on the two previous loans and received points from the borrower. Aframian did not

remember if he paid Elyaszadeh for those services. Relative to the loan related to Freeport Renaissance, Elyaszadeh told him that the note would be personally guaranteed by all three members of Freeport Renaissance. His understanding was that this would be a personal loan to the three members of Freeport Renaissance. He did not believe that he was loaning money to Freeport Renaissance. Aframian testified that when he received the loan documents, he did not review them. He relied on Elyaszadeh's personal representations and believed he was receiving a personal guarantee.

[3. *The Cross-Motion for Summary Judgment and Trial Court's Ruling*]

On June 27, 2017, the plaintiff filed a brief in support of its motion for summary judgment as to counts IV and V, seeking judgment on the personal guaranties of Atighehchi and Elyaszadeh respectively. On July 3, 2017, Atighehchi filed a cross motion for summary judgment on count IV. A hearing was held on the motions on October 4, 2017. ***

On January 22, 2018, the trial court presented its decision in court. The trial court found that the additional guarantee signed by Elyaszadeh as an individual and naming him as the guarantor was specific and unambiguous. The trial court granted the plaintiff's motion for summary judgment against Elyaszadeh on count V. With respect to Atighehchi, the trial court found that the Guaranty was 'sloppy.' The trial court acknowledged that the plaintiff wanted a personal guarantee from all three members of Freeport Renaissance, but found that it did not get it. The trial court noted that Santos' email stated that the guarantee was a 'blanket personal guaranty with all three members.' The trial court found that the term 'members' was used to

- 9 -

guarantee the loan and it applied to Freeport Renaissance, not the members individually. The trial court further found that the term 'individual' next to Atighehchi's signature on the Guaranty did not control the capacity in which the document was signed. The trial court noted that the Guaranty listed Freeport Renaissance as the guarantor and that Atighehchi was not listed anywhere in the document as an individual. Further, the document referred only to a singular guarantor, and did not use the plural 'guarantors.' The trial court thus granted summary judgment on count IV in favor of Atighehchi ***. The plaintiff filed a timely notice of appeal." *Freeport Renaissance*, 2019 IL App (2d) 180404-U, ¶¶ 2-17.

¶ 7                                   C. The Second District Appeal

¶ 8          On appeal, the Second District summarized plaintiff's arguments as follows:

"[T]he plaintiff argues that the trial court erred in granting summary judgment in favor of Atighehchi on count IV. The plaintiff argues that the Guaranty is ambiguous and interpreting it to find that Freeport Renaissance was guaranteeing its own debt is an absurd result. Further, the plaintiff argues that the uncontested extrinsic evidence supports a conclusion that the parties intended that Atighehchi would be personally liable on the Guaranty." *Id.* ¶ 19.

The appellate court explained that, based on the agreement of the parties and the terms of the Guaranty, California substantive law applied, but the court would be following Illinois procedural law. *Id.* ¶ 20.

¶ 9          The Second District concluded that "the trial court erred in granting summary judgment in favor of Atighehchi because the Guaranty [was] ambiguous and the extrinsic evidence

- 10 -

raise[d] genuine issues of material fact." *Id.* ¶ 24. In its analysis, the court wrote the following:

"First, the Guaranty is ambiguous on its face. While the Guaranty defines the guarantor as 'Freeport Renaissance LLC,' the signature block contains no reference to Freeport Renaissance. Elyaszadeh signed as the manager of PCH and Mirbod and Atighehchi each signed as 'an individual.' Thus, none of the signatures aligned with the named Guarantor. Further, paragraph 19b of the Guaranty states that 'the term "Guarantor" shall be deemed to refer to any one or both of the parties constituting Guarantor.' This implies that there are two parties that are guarantors. Further, paragraph 9 indicates that the Guaranty would be binding upon 'the executors, administrators, personal representatives, legatees, heirs, successors and permitted assigns of Guarantor.' This language indicates that the Guaranty is a personal guaranty, which is at odds with Freeport Renaissance being a corporate guarantor.

Additionally, a provisional examination of the extrinsic evidence also reveals some ambiguity. The guarantor is defined in the Guaranty as Freeport Renaissance, LLC. However, the Guaranty was executed along with other instruments including a note, a deed of trust and a security agreement. The security agreement named the guarantor as Freeport Renaissance but defined the guarantor as 'an individual whose residence is in Los Angeles County.' Further, it was seemingly absurd for the parties to execute a guaranty with Freeport Renaissance as the guarantor since Freeport Renaissance was also the borrower on the promissory note. Generally, a guarantor is a separate third party, not the borrower. Finally, Atighehchi signed the deed of trust as a member of Freeport Renaissance

and if the parties intended for the Guaranty to be a corporate guaranty, they could have signed it the same way.

We thus turn to the extrinsic evidence to interpret the contract. If the extrinsic evidence were not conflicting, summary judgment would be proper. [Citation.] However, the extrinsic evidence is conflicting and there are genuine questions of material fact which preclude the entry of summary judgment for either party. While Atighehchi argues that the parties' intent was that the Guaranty serve a corporate guaranty, the depositions of Santos and Aframian indicate that the parties intended that it be a personal guarantee from all three members of Freeport Renaissance. Further, while ambiguities in a contract should normally be construed against the drafter, it is unclear whether Mortgage Bankers and Santos were drafting the documents on behalf of the plaintiff, as in previous loan transactions, or whether they were drafting the loan documents on behalf of Freeport Renaissance and its members. If Santos and Mortgage Bankers were drafting the documents on behalf of Freeport Renaissance, there is a question as to whether Santos was acting on behalf of Atighehchi. In her deposition, Atighehchi stated that she did not authorize Santos to act on her behalf, but the record also indicates that she acquiesced in allowing Elyaszadeh to obtain the loan from the plaintiff on behalf of Freeport Renaissance and to determine the terms of the loan. Because the Guaranty is ambiguous and there are genuine questions of material fact, the trial court erred in granting summary judgment in favor of Atighehchi." *Id.* ¶¶ 24-26.

¶ 10   The Second District reversed and remanded for further proceedings. *Id.* ¶ 33.

¶ 11               D. The Bench Trial and Trial Court's Ruling

¶ 12    In September 2022, the trial court conducted a bench trial on count IV of the amended complaint. Although the majority of the evidence was consistent with the earlier described deposition testimony, the parties presented some critical new evidence that responded to and addressed the ambiguities and questions of fact identified by the Second District in is Rule 23 order. Similarly, the trial court relied heavily on that order in its written ruling, and its findings primarily addressed the same ambiguities and questions of fact.

¶ 13    In February 2023, the trial court entered a written order entering judgment in favor of Atighehchi and finding that plaintiff failed to meet its burden of proof to show that the parties mutually intended for the Guaranty to personally bind Atighehchi. Because the court's detailed written judgment thoroughly explained (1) the relevant evidence that formed the basis for the court's factual findings and (2) the reasoning of the court's ruling, we set forth the court's order at length.

"The defense argues and this Court agrees that the parameters of the Court's ability to analyze and interpret the Guaranty's signature block is not limited to the four corners of the document. Under Section 1642 of the California Civil Code, 'Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.' Cal. Civ. Code § 1642. This Court must also consider the other contracts relating to this loan transaction between Plaintiff and Freeport Renaissance: the Promissory Note, the Security Agreement, the Environmental Indemnity Agreement, and the Deed of Trust.

In this case, the parties stated objective intent is in evidentiary conflict. In his deposition and at trial, Plaintiff [(Aframian)] stated he would not have lent the

- 13 -

money without a personal guarantee. He asserted he always requires a personal guaranty to lend money. At trial, Defendant [(Atighehchi)] under oath stated she would never have borrowed the money from Plaintiff if a personal guarantee was required. Obviously, in accordance with California law, the subjective intent of one of the parties would not be enough to carry the day.

Additionally, the evidence surrounding the drafting of the loan documents (and for which party the doctrine of *contra proferentem* applies because of those ambiguities) is in dispute. Because of these factual disputes, in this case, the Court may also consider extrinsic evidence beyond the language of the related transactional documents.

It is important to detail the facts as they pertain to the subject property and the specific loan at issue. Plaintiff, though a jeweler by trade, has acted as a lender in many other loan transactions. In most of these transactions, Elyaszadeh has acted as the go between. When parties seeking a loan through non-conventional means are in search of a lender, Elyaszadeh establishes a connection between those potential borrowers and Plaintiff. This relationship between those parties is not new and has been in existence for many years.

These types of financially non-invasive loan transactions were referred to in this case as 'hard money' loans. Such loans, though not rising to the level of 'loan sharking' where exorbitant interest rates are attached, do carry higher rates of interest than commercial loans, but, more importantly, they do not fall under the typical commercial lending institutions governance where standard and customary security requirements are necessary. For example, for approval and acceptance by

a 'hard money' lender, an estoppel certificate is not necessary. In this case, Defendant was not even asked to provide a birth certificate, credit report, financial statement or driver's license.

The evidence in this case also showed that when Plaintiff would make 'hard money' loans and Elyaszadeh was involved, it was common practice for Plaintiff to have Elyaszadeh vouch for the borrowers by having him sign his own personal guaranty in Plaintiff's favor. Defendant highlighted this practice through a prior 'hard money' loan transaction that occurred on October 30, 2009, in which Plaintiff loaned $800,000 to Del Capital Development LLC, Albert Delshad and Barbara Jane Delshad. See Defendant's Exhibit 14 (Del Capital/Delshad Promissory Note and Security Agreement). This Note was supported by three personal guarantees: a personal guaranty by Shahram Elyaszadeh (Exhibit 16), a personal guaranty by Barbara Jane Delshad (Exhibit 17), and a personal guaranty of Albert Delshad (Exhibit 18).

Based on the history of their ongoing business relationship, Elyaszadeh would normally be compensated for helping establish new connections for 'hard money' loans *and* drafting the loan documents that Plaintiff required. In the case at hand, Elyaszadeh was paid $30,000.00 as a loan origination fee for bringing the parties together and an additional $1,500.00 for loan document preparation. As Defendant points out, Defense Exhibits 16, 17 and 18 involve the abovementioned Del Capital loan documents that include guaranty agreements substantially similar to the template language used in the Freeport Renaissance Guaranty and Elyaszadeh Guaranty. It should be obvious that Elyaszadeh, or agents within his control, were

creating loan documents from their own word processing applications by deleting old borrowers' names and adding new borrowers' names and cutting and pasting paragraphs and tailoring clauses that fit each particular loan. Defendant's Exhibit #7 is an example of that practice where in paragraph A., Albert Delshad (from Defense Exhibit 17) is incorrectly named as the Borrower.

In accordance with the history of the case as detailed by the Appellate Court in its Rule 23 Order, in 2010, Elyaszadeh approached Plaintiff to obtain a loan for the Freeport Renaissance, LLC owned property located in Freeport, Illinois. Elyaszadeh, through another company owned by him, E&E Mortgage Bankers, LLC, had his employee, Allen Santos, prepare the loan documents. Santos prepared four loan documents: a promissory note, a security agreement, a deed of trust, and a guarantee. As stated earlier, these loan documents were substantially similar to the Del Capital loan documents.

[(The trial court described the Guaranty and loan documents consistent with the Second District's order.)]

* * *

Typically, ambiguities in a contract should normally be construed against the drafter. The evidence in this case is unclear whether Mortgage Bankers and Santos were drafting the loan documents on behalf of Plaintiff, as in previous loan transactions, or whether they were drafting the loan documents on behalf of Freeport Renaissance and its members, including Defendant. If Santos and Mortgage Bankers were drafting the documents on behalf of Freeport Renaissance, there is a question as to whether Santos was acting on behalf of Defendant.

Defendant stated that she did not authorize Santos to act on her behalf, but the record also indicates that she allowed Elyaszadeh to obtain the loan from Plaintiff on behalf of Freeport Renaissance and to determine the terms of the loan.

The email communications between Plaintiff and Santos, who was not an attorney and employed by Elyaszadeh at the time the loan documents were prepared, are directives from Plaintiff. Defendant had known Elyaszadeh for a number of years prior to the origination of the loan at issue through his relationship with her father. But it was not shown at trial that she, in any way, had a hand in the preparation of the loan documents. The process used in the matter before the Court was nearly indistinguishable from [the] process used in many prior transactions that involved Plaintiff and Elyaszadeh, but for the substitutions of new names and amounts and, this was Defendant's first loan ever consummated with Plaintiff. These loan documents were used on multiple occasions previously by Plaintiff and Defendant had only seen them once.

Plaintiff had testified he did not read the documents, but Defendant, an experienced Beverly Hills, California Real Estate professional, also had said she did not read the loan documents before she signed them—she just looked at the first and last pages. Defendant did not know who drafted the note. She acknowledged that she signed the deed of trust the same day as the note. She did not know who drafted it and did not review that document before she signed it. She acknowledged that she signed the deed of trust as a member of Freeport Renaissance. She also acknowledged that she signed the Guaranty in her individual capacity but stated that she believed the guarantor was Freeport Renaissance. She believed that the

- 17 -

term 'an individual' next to her signature referred to the fact that she was an individual member of Freeport Renaissance. Again, she stated that she never would have personally guaranteed the note.

*  *  *

This portion of the Appellate Court ruling and directions bears repeating: A court's paramount consideration in construing a contract is the parties' objective intent, as evidenced by the plain language of the contract, rather than the subjective intent of *one of the parties* (emphasis added).

The extrinsic evidence showed that it was not just one of the parties' subjective intent, but at a minimum two, Defendant and Mirbod. Again, Elyaszadeh had stated he informed Plaintiff that Defendant and Mirbod would not execute personal guarantees. And, Plaintiff required Elyaszadeh to execute his own personal guaranty that identified Elyaszadeh as the guarantor and borrower.

The Court agrees with the Defendant that Plaintiff's lack of diligence and overt carelessness caused what uncertainty may continue to exist in this transaction. Again, Plaintiff testified that he did not even read the substance of the documents because they were 'too heavy.' Plaintiff testified that he neither spoke to Defendant directly nor asked for any of her personal financial statements to demonstrate creditworthiness. Plaintiff testified he only read two things of a document: the title and the signature. Therefore, the totality of the evidence did not show by a preponderance of the evidence standard, that there was a meeting of the minds between Plaintiff and Defendant and that there was a mutual intent for Defendant to personally guarantee the underlying note at the time the contract was formed.

Defendant correctly asserts that: [t]he Guaranty explicitly identifies the Guarantor as 'FREEPORT RENAISSANCE LLC, a Nevada Limited Company.' This identification begins in the second line on the first page of the document. 'Freeport Renaissance' is highlighted in bold, capitalized font, to set it apart from the other language in the document. In bold, capitalized font, the Guaranty also identifies the Borrower as 'FREEPORT RENAISSANCE LLC, a Nevada Limited Company.' This identification of the Borrower immediately occurs in the second paragraph on the first page of the document, approximately one (1) inch below the identification of the Guarantor. References to Freeport Renaissance as the Guarantor appear not once, not twice, but fifteen (15) times throughout the agreement. Not only does the Guaranty define Freeport Renaissance as Guarantor at the outset, the document labels itself the 'Freeport Renaissance LLC Guaranty' prominently at the bottom of every single page. In the 'Notices' section in paragraph 7, the Guarantor is once again identified as 'FREEPORT RENAISSANCE LLC,' in bold, capitalized font.

The Appellate Court provided guidance on this issue in that the Guaranty was executed along with other instruments including a note, a deed of trust and a security agreement. The security agreement named the guarantor as Freeport Renaissance but defined the guarantor as 'an individual whose residence is in Los Angeles County.' The extrinsic evidence at trial identified more than one party or individual as having residence in California. Also, the identical language was included in the Del Capital documents and the only guarantor appearing on both documents was Elyaszadeh.

Additionally, the Appellate Court opined that: it was seemingly absurd for the parties to execute a guaranty with Freeport Renaissance as the guarantor since Freeport Renaissance was also the borrower on the promissory note. Generally, a guarantor is a separate third party, not the borrower. Finally, Defendant signed the deed of trust as a member of Freeport Renaissance and if the parties intended for the Guaranty to be a corporate guaranty, they could have signed it the same way.

Defense argues: [w]hile the Deed of Trust does contain different language; this Court cannot ignore the manner in which 'an individual' follows Defendant's name in the Promissory Note, the Security Agreement, and Environmental Indemnity Agreement. In those documents, there is no dispute that she signed her name in her capacity as an individual member on behalf of Freeport Renaissance. So even with the discrepancy in the Deed, Defendant urges the Court to interpret 'an individual' following Defendant's name in the Guaranty as signifying her capacity as an individual member on behalf of Freeport Renaissance, just as with the other related transactional documents.

* * *

*** Even though having [a] corporate guarantee instead of [a] personal guaranty may seem absurd, the extrinsic evidence introduced at trial did give credence to the practice being common in the State of California.

At trial Attorney Wallace testified (remotely) that in California it is not uncommon that lenders require borrowers to also guarantee the underlying indebtedness. When the borrower and guarantor are the same, or the same in principle, these are referred to as 'sham guarantees' by California courts. Wallace

explained that 'hard money' lenders like Plaintiff require borrowers to not only sign the notes, but also provide guaranty agreements. Additionally, he opined that 'hard money' lenders do not fully understand that doing so amounts to a redundant guaranty agreement. Per Wallace, this is a customary practice in California.

Also, in applying fundamental California principles, 'A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.' Cal. Civ. Code § 1643. In this case, Plaintiff has failed to prove by a preponderance of the evidence that the intent of the parties was mutually agreed to.

Therefore, it is this Court's opinion based on the totality of the evidence, that Defendant had no hand in the creation of the loan documents. Furthermore, she did not ask they be altered in any way and she did nothing more than sign her name once those documents were presented to her. Plaintiff, on the other hand, had engaged in a long-term mutually beneficial business relationship with Elyaszadeh that pre-existed the $600,000.00 loan at issue. Loan documents (nearly identical to this case's boilerplate forms) had been created and used for the joint benefit of Plaintiff and Elyaszadeh, and because Plaintiff was or should have been very familiar with the loan documents and since he used his authority to demand changes to these loan documents: that [it] was Plaintiff and not Defendant who took on the role of the drafter. And, in accordance with application of California law, any ambiguity in a contract should be construed against the drafter. [Citation.]

Finally, '[w]ords in a contract which are wholly inconsistent with its nature,

or with the main intention of the parties, are to be rejected.' Cal. Civ. Code § 1653. The operative words here are 'guarantor' and 'an individual.' The Guaranty executed by Defendant and signed by her as 'an individual', was approved and accepted by Plaintiff for purposes of funding this $600,000.00 loan. The Guarantor was identified numerous times throughout the document, solely, specifically and unequivocally as Freeport Renaissance LLC. In addition, paragraph 9 of the Guaranty that indicates that the Guaranty would be binding upon 'the executors, administrators, personal representatives, legatees, heirs, successors and permitted assigns of Guarantor.' The Appellate Court previously opined, for summary judgment purposes, that this language indicates that the Guaranty is a personal guaranty, which is at odds with Freeport Renaissance being a corporate guarantor. But, there is additional language in the Guaranty that provides much needed clarity and in the eyes of this Court, settles the question.

As previously stated, paragraph 21 of the Guaranty states: [e]ach individual whose signature appears below represents and warrants to the other party that such individual has the full power, authority and legal right to execute this Guaranty for himself or herself (and/or for any legal entity on behalf of which he or she signs) and to perform all obligations on his, her or its part under the Guaranty. This language, however absurd in this context in Illinois, allowed Defendant to properly sign as 'an individual' and thus bind the legal entity, Freeport Renaissance LLC, to its terms. This contractual act was established at trial as being a common practice in California, and therefore not so absurd at the time of the formation of the contract." (Emphases in original.)

¶ 14       This appeal followed.

¶ 15       II. ANALYSIS

¶ 16       Plaintiff appeals, arguing that (1) the trial court erred by finding the Guaranty and Atighehchi's signature as "an individual" was ambiguous under California law and (2) the court's conclusion that the parties intended Atighehchi to sign as a member of Freeport Renaissance was against the manifest weight of the evidence. We disagree.

¶ 17       A. Plaintiff's New Arguments Are Forfeited

¶ 18       As an initial matter, we note that plaintiff argues on appeal that the trial court erred by finding that the guaranty was ambiguous because various provisions of the California Commercial Code required it to presume that Atighehchi's signature as "an individual" was an "anomalous indorsement," making her an "accommodation party" that is personally liable on both the note and the Guaranty. Atighehchi responds that these arguments were not raised in the trial court or at any point in the prior litigation and are therefore forfeited. We agree with Atighehchi.

¶ 19       In essence, plaintiff argues that certain statutory provisions control how the trial court, and this court, should construe Atighehchi's signature on the loan documents. However, plaintiff did not cite these statutes either in the trial court or to the Second District during the prior appeal. Instead, in its written closing argument to the trial court, plaintiff conceded that the guaranty was ambiguous as the Second District concluded. Accordingly, a litany of legal doctrines bar plaintiff from raising these new arguments for the first time in this appeal, such as the law-of-the-case doctrine, acquiescence, invited error, and forfeiture.

¶ 20       Most simply, we conclude that plaintiff forfeited these arguments by failing to raise them before the trial court during the bench trial. Because it would be unfair to Atighehchi and the trial court to consider these new arguments for the first time in this appeal, we hold plaintiff to that

forfeiture and consider only whether the trial court's findings were against the manifest weight of the evidence.

¶ 21                    B. Whether the Trial Court's Findings Were Against

the Manifest Weight of the Evidence

¶ 22    Before proceeding to the analysis of the trial court's judgment, we note that plaintiff mischaracterizes the trial court's ruling when it asserts that the court found that the parties intended for Atighehchi to sign in a representative capacity as part of a corporate guarantee and that she did, in fact, sign in such a capacity. To the contrary, the trial court ruled that plaintiff failed to meet its burden of proof that the parties mutually intended the Guaranty to be a personal guaranty. That is, the court did not make an affirmative finding regarding what the parties intended but instead concluded that plaintiff failed to meet its burden of proof to recover against Atighehchi on the Guaranty.

¶ 23                         1. *The Applicable Law*

¶ 24    Throughout this case, the parties have agreed that Illinois law governs all procedural matters and California law applies to all the substantive legal issues.

¶ 25        a. The Applicable Illinois Procedural Law and Standard of Review

¶ 26    This case fundamentally involves contract interpretation, given that the central issue is whether the parties intended for Atighehchi to be personally liable under the terms of the Guaranty, which she signed as "an individual." The interpretation of contracts presents an issue of law that appellate courts review *de novo*. *In re Marriage of Dynako*, 2021 IL 126835, ¶ 15, 186 N.E.3d 393.

¶ 27    However, the Second District previously held that the Guaranty was ambiguous both on its face and after considering the limited extrinsic evidence available at summary

judgment. On remand, the trial court conducted a bench trial to consider all the extrinsic evidence, as mandated by the Second District's order, to determine the meaning of the contract and the intention of the parties. Accordingly, the applicable standard of review for this appeal is whether the trial court's factual findings were against the manifest weight of the evidence. See *Wiczer v. Wojciak*, 2015 IL App (1st) 123753, ¶ 33, 30 N.E.3d 670 ("The interpretation of contracts generally is subject to a *de novo* standard of review, but the factual findings that inform this interpretation are given deference on review and are to be reversed only where they are against the manifest weight of the evidence."); see also *Clanton v. Oakbrook Healthcare Centre, Ltd.*, 2023 IL 129067, ¶ 31, 226 N.E.3d 1266 (explaining that *de novo* review is appropriate when interpreting an arbitration agreement "where there was no evidentiary hearing or findings of fact").

¶ 28 Generally, the standard of review following a bench trial is whether the trial court's order or judgment is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12, 965 N.E.2d 393. "A judgment is against the manifest weight of the evidence only when the findings appear to be unreasonable, arbitrary, or not based on evidence, or when an opposite conclusion is apparent." *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 23, 50 N.E.3d 643. "The manifest weight of the evidence standard affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony." *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59, 82 N.E.3d 763. The appellate court therefore does not substitute its judgment for that of the trial court and will not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the trier of fact. *Diocese of Quincy v. Episcopal Church*, 2014 IL App (4th) 130901, ¶ 38, 14 N.E.3d 1245. Accordingly, the trial court's judgment will be affirmed

provided the record contains any evidence supporting it. *In re Estate of Wilson*, 238 Ill. 2d 519, 570, 939 N.E.2d 426, 456 (2010).

¶ 29                    b. The Applicable California Substantive Law

¶ 30        In its written order, the trial court heavily—and properly—relied on the Second District's statements of California law from the prior appeal, and we do the same. See *Fox Valley Families Against Planned Parenthood v. Planned Parenthood of Illinois*, 2018 IL App (2d) 170137, ¶ 9, 101 N.E.3d 132 ("When an appellate court decides a question of law, that decision ordinarily binds both the trial court on remand and the appellate court in a subsequent appeal.").

¶ 31        The Second District summarized the applicable law as follows:

"Under California law, the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties. *Bank of the West v. Superior Court*, 833 P.2d 545, 552 (Cal. 1992). Intent is to be inferred from the written provisions of the contract (*State of California v. Continental Insurance Co.*, 281 P.3d 1000, 1004 (Cal. 2012)) and if the contractual language is clear and explicit, and does not involve an absurdity, it governs (Cal. Civ. Code § 1638). The language in a contract must be construed in the context of the instrument as a whole and in the circumstances of the case. *Bank of the West*, 833 P.2d at 552. A court's paramount consideration in construing a contract is the parties' objective intent, as evidenced by the plain language of the contract, rather than the subjective intent of one of the parties. *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 514 (Cal. Ct. App. 2003). Any ambiguity in a contract should be construed against the drafter. *Cathay Bank v. Lee*, 18 Cal. Rptr. 2d 420, 424 (Cal. Ct. App. 1993).

If the meaning of the contract language is in dispute, the trial court may provisionally consider extrinsic evidence to determine the parties' intent only where it is relevant to prove a meaning to which the language is reasonably susceptible. *Pacific Gas & Electric Company v. G.W. Thomas Drayage & Rigging Company, Inc.*, 442 P.2d 641, 644 (Cal. 1968). If the court determines that the language is reasonably susceptible to more than one interpretation, the contract is ambiguous and the court must determine what construction is to be placed on the ambiguous language by applying the standard rules of interpretation. *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 132 Cal. Rptr. 2d 151, 158 (Cal. Ct. App. 2003). The extrinsic evidence is then admitted to aid in interpreting the contract. *Wolf v. Superior Court*, 8 Cal. Rptr. 3d 649, 656 (Cal. Ct. App. 2004)." *Freeport Renaissance*, 2019 IL App (2d) 180404-U, ¶¶ 22-23.

¶ 32                                          2. *This Case*

¶ 33                      a. The Alleged Absurdity of a Redundant Corporate Guarantee

¶ 34            Plaintiff argues that the trial court's decision was erroneous because accepting Atichehchi's interpretation of the agreement creates the absurd result that Freeport Renaissance executed a meaningless guarantee when it was already directly liable on the note. Regarding this issue, the trial court heard competing experts testify about the standard practices of lenders in California and the prevalence of "sham guarantees." The court explicitly found Wallace, Atichehchi's expert, credible and persuasive on those issues. The court noted that the Second District suggested that it would be absurd to have a corporate guarantee when the corporation was already liable on the note but concluded that the evidence presented at trial—specifically, Wallace's testimony about the standard practices of "hard money" lenders in California, who

frequently require parties to execute redundant guarantees, mistakenly believing that such guarantees give them more security on the loan—adequately provided a rational explanation for a seemingly irrational agreement.

¶ 35 In addition, the trial court relied on evidence of past loan transactions between Elyaszadeh and Aframian to demonstrate a contrast between the guaranties in those transactions with the one at issue in this case. In particular, the court noted that in earlier transactions that Elyaszadeh drafted for Aframian, the guaranties explicitly defined the guarantors by naming the corporate entities and the individuals who were guaranteeing the loan, specifically identifying those persons *as individuals*. By contrast, Atighehchi's name does not appear anywhere in any of the Freeport Renaissance loan documents, including the Guaranty. Instead, the loan documents and the Guaranty repeatedly and conspicuously identified the guarantor as Freeport Renaissance "a California limited liability company."

¶ 36 This court has frequently recognized that when the trial court, after being presented with conflicting testimony, accepts and credits one version of events and rejects the other, we are at the height of our deference to those findings. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 57, 187 N.E.3d 763; see *People v. House*, 2023 IL App (4th) 220891, ¶¶ 89, 105-06. Here, the trial court heard conflicting evidence from two experts about whether redundant corporate guaranties were common in California for "hard money" loans and accepted Wallace's testimony as true in its order. Accordingly, we defer to the trial court's credibility determination.

¶ 37 b. The Drafter of the Guaranty Agreement

¶ 38 As the Second District noted, resolving the ambiguity of whether the Guaranty Agreement was intended to personally bind Atighehchi depended, in part, on determining which party drafted the Guaranty so the terms could be construed against the drafter. On appeal, plaintiff

argues that the trial court erred by finding that Elyaszadeh drafted the documents on behalf of Aframian and not on behalf of Atighehchi or Freeport Renaissance. We disagree.

¶ 39        In its written order, the trial court relied heavily upon the extrinsic evidence of prior loan transactions involving Elyaszadeh and plaintiff. The court primarily considered two types of evidence. First, the court explained the testimony describing the regular course of conduct of how Elyaszadeh connected borrowers with plaintiff, received an origination fee, drafted the documents, and received a fee for drafting the documents. The court noted that the Freeport Renaissance loan was drafted and consummated in the same manner, including Elyaszadeh's receiving a fee for both originating the loan and drafting the loan documents, which fees were paid out of the proceeds of the loan.

¶ 40        Second, the trial court examined a 2009 transaction involving Del Capital and plaintiff, which had guaranties that used nearly identical language but clearly listed the individual members of Del Capital as guarantors within the express terms of the guarantee. The court noted that the only guarantor appearing on both documents was Elyaszadeh.

¶ 41        Relying on these two forms of evidence, both of which established a customary course of conduct between plaintiff and Elyaszadeh, the trial court concluded that Elyaszadeh similarly drafted the Freeport Renaissance loan documents in this case on plaintiff's behalf.

¶ 42                        c. The Burden of Proof at Trial

¶ 43        In its order, the trial court made clear that plaintiff had failed to meet its burden to persuade the trial court that the guaranty was mutually intended by the parties to be a personal guarantee, writing, "At trial, the burden was on Plaintiff to prove by a preponderance of the evidence that the parties mutually intended for Defendant to personally guarantee the $600,000.00 loan." The court repeatedly stated, explicitly, that the parties failed to present all of the evidence

available or evidence that would have added clarity to resolving the competing interpretations offered by the parties. The court concluded that "the totality of the evidence did not show by a preponderance of the evidence standard, that there was a meeting of the minds between Plaintiff and Defendant and that there was a mutual intent for Defendant to personally guarantee the underlying note at the time the contract was formed."

¶ 44        The trial court expressed dissatisfaction with both Aframian and Atighehchi, lamenting their admissions at trial that, although they were both experienced and sophisticated actors in real estate transactions, neither one of them read more than the first or last page of what they were signing or put more than a cursory effort into the deal. They paid little attention to details, relied on Elyaszadeh instead of consulting their own lawyers, and blindly executed documents to finalize the loan without bothering to ask questions or know the specifics or details of what they were agreeing to.

¶ 45        We find the Illinois Supreme Court's reasoning in *Redmond v. Socha*, 216 Ill. 2d 622, 647, 837 N.E.2d 883, 897-98 (2005), helpful. In *Redmond*, the supreme court examined whether a jury entered legally inconsistent verdicts when they found against both drivers, who were suing each other over a two-car accident. *Id.* at 625-26. Each driver claimed the other driver negligently caused the accident and sought damages, and the parties both agreed that the accident was entirely caused by one of the drivers' negligent actions. *Id.* at 626. The supreme court upheld the jury's verdicts and rejected the parties' claims that one party had to be liable. *Id.* at 647. The court explained as follows:

> "Even though it is clear in the present case that 100% of the responsibility for the accident must rest, in some unknown proportion, upon either or both of the parties, it is still possible that the jury found the evidence 'so conflicting, inconclusive, and

- 30 -

unsatisfactory that it simply could not determine from the evidence presented' [citation], whether Redmond was negligent and, if so, to what degree, and whether Socha was negligent and, if so, to what degree." *Id.*

¶ 46 The same reasoning applies here. Although logic dictates that the Guaranty was either solely a corporate guaranty, a personal guaranty, or both, the trial court was not required to make a conclusive determination in the absence of sufficient evidence from plaintiff. In other words, plaintiff, as the party seeking to hold Atighehchi personally liable on the Guaranty, was required to present adequate evidence to satisfy its burden of proof that the Guaranty bound Atighehchi personally, thereby entitling plaintiff to a deficiency judgment.

¶ 47 The trial court, after considering all of the evidence, was so dissatisfied with the evidence presented that it essentially determined that *neither* party was able to prove that its interpretation of the Guaranty was correct. For example, the court rejected Atighehchi's claim that the deed of trust was fraudulently amended but did point out that the parties had engaged in improper conduct pertaining to the case and accepted that there was clearly more evidence available than what the parties presented. Specifically, the court found that "some of the other improper actions of the parties (covert meetings and phone calls attempting to alter/slant trial testimony and the like) do give rise to at a minimum a consideration that there was additional evidence not brought to light at trial."

¶ 48 Given that the trial court was (1) convinced that the parties had additional evidence they did not present at trial and (2) dissatisfied with both Aframian and Atighehchi and skeptical of their testimony, the court was entirely justified to conclude that the evidence presented at trial was insufficient to resolve the ambiguities presented by the plain language of the Guaranty and the conflicting extrinsic evidence offered by the parties.

¶ 49        Once the Second District found that the Guaranty was ambiguous on its face *and* that the extrinsic evidence available at summary judgment was also ambiguous, plaintiff, as the party bearing the burden of proof, was obligated to resolve those ambiguities at trial to succeed on its claim. Critically, in the prior appeal, plaintiff argued that the Guaranty and the extrinsic evidence presented at summary judgment demonstrated that the Guaranty was unambiguous that Atighehchi was personally liable. At summary judgment, the court is required to look at the evidence in the light most favorable to the nonmovant. The Second District, after considering the evidence presented at summary judgment in the light most favorable to each party, held that neither party had demonstrated that the record was clear and free from doubt that one party was entitled to judgment as a matter of law.

¶ 50        At trial, the trial court was not required to look at the evidence in favor of either party or draw inferences in either party's favor. Instead, the court was a free agent and could accept or reject the evidence presented as it wished, so long as it did not do so arbitrarily or unreasonably. Nonetheless, all of the arguments plaintiff raises on appeal pertain to how the trial court could have viewed the evidence in the plaintiff's favor. We note that had the court done so, given our deferential standard of review, it would not be at all surprising for this court to similarly conclude that a ruling in plaintiff's favor was not against the manifest weight of the evidence.

¶ 51        Accordingly, we conclude that the trial court's judgment was not against the manifest weight of the evidence.

¶ 52                  III. CONCLUSION

¶ 53        For the reasons stated, we affirm the trial court's judgment.

¶ 54        Affirmed.